# Exhibit LL

## IN ARBITRATION PROCEEDINGS BEFORE THE
## FINANCIAL INDUSTRY REGULATORY AUTHORITY

-----------------------------------------------------------------X

**MARK CHRISTOPHER HUTCHINSON,**
**DAVID ALAN HIRSCH,**
**PAUL GERARD VANDEN HEUVEL,**
**MICHAEL EDWARD SAKACH,**
**JAMES WHITNEY, JAMES C. KELLY,**
**MARY D. DICHRISTOFANO, and**
**MICHAEL RYAN  BOARD,**

                                                    **FOURTH AMENDED**
          **Claimants,**                            <u>**STATEMENT OF CLAIM**</u>

            **-v-**

                                                    **FINRA No. 16-02825**

**CREDIT SUISSE SECURITIES (USA) LLC,**

          **Respondent.**
-----------------------------------------------------------------X

Claimants  Mark  Christopher  Hutchinson,  David  Alan  Hirsch,  Paul  Gerard  Vanden  Heuvel,

James  Whitney,  Michael  Edward  Sakach,  Mary  DiChristofano,  James  C.  Kelly,  and  Michael

Ryan  Board,  by  and  through  their  counsel Lax & Neville LLP,  hereby  submit  the  following

claims  against  Respondent  Credit  Suisse  Securities  (USA)  LLC  to  arbitration  pursuant  to  the

Code  of  Arbitration  Procedure  for  Industry  Disputes  of  the  Financial  Industry  Regulatory

Authority, and allege as follows:

### <u>PRELIMINARY STATEMENT</u>

1.      Credit Suisse made the decision to close its US Private Bank in mid-July 2015.

By the end of July, it had stopped recruiting and rescinded outstanding recruitment offers.  At the

beginning  of  August,  it  informed  certain  advisors  that  the  business  would  be  sold  or  closed.

Between August 19 and 21, Credit Suisse AG's Board of Directors approved its CEO's decision

to  "divest"  the  US  Private  Bank.   In  September  and  October,  it  lost  several  top  teams  after  its

internal turmoil and failure to find a buyer became public knowledge. On October 20, having

concluded that it would not find a buyer, it announced that it was closing the US Private Bank. In November and December, it held its final branch meetings. In February, it notified employees of its "Special Termination Program In Connection With the February 2016 U.S. Reduction in Force" and sent them Notices of Termination that began: "Regrettably, due to current business conditions, your employment with Credit Suisse (or the Credit Suisse subsidiary by which you now are employed) will be permanently terminated on the date indicated in Attachment 3 hereto as your Employment Termination Date." On February 19, it sent form client letters to its remaining investment RMs reiterating that "Credit Suisse has decided to exit the Private Banking business in the U.S. by March 31, 2016" and warning that "after March 31, 2016 Credit Suisse will no longer provide brokerage or investment advisory services or provide any investment advice to your account(s)."

2. Though it characterized this as a mass layoff to the Department of Labor and a business closure to investors and the public, in U-5 filings and litigation Credit Suisse has taken the position that all of its RMs "voluntarily" "resigned." Whether an RM left in October, when its closure was announced; November, December or January, when the branches were being dismantled and most employees at all levels were leaving; February, when termination notices had been sent to remaining employees and clients had been told to transfer out their accounts as soon as possible; or March, when the offices were virtually empty and only a handful of RMs were left and remaining clients were again told to transfer out their accounts as soon as possible, he or she "voluntarily" "resigned."

3. The reason for this fiction is simple. Having failed to sell its US Private Bank, Credit Suisse was faced with paying its outstanding liabilities, including $245 million in earned deferred compensation to its RMs. Each RM's deferred compensation is governed

by one or more Award Certificates, under the terms of which the Awards are cancelled upon voluntary termination or termination for cause and immediately vested upon involuntary termination. This is the entire case: Credit Suisse apparently believes it can avoid paying its RMs their earned wages simply by pretending they were not involuntarily terminated when it told them they had to find someplace else to work.

4.      In order to disguise this obvious breach of the Award Certificates and the labor laws of a dozen states, Credit Suisse concocted an unprecedented "exclusive recruiting agreement" with Wells Fargo & Company that gave Wells Fargo extraordinary access to Credit Suisse's RMs, smoothed the transition process, and, above all, leveraged earned deferred compensation to pressure RMs into accepting a platform that was not suitable to their clients. Credit Suisse then took the position that RMs who did not or, in many cases, could not go to Wells Fargo under this "exclusive recruiting agreement," and even RMs to whom Wells Fargo did not make offers, "resigned" "voluntarily."

5.      Leaving aside that Credit Suisse had no legal or contractual right to select any employee's next employer, this deal was ruthless to its RMs. Wells Fargo did not make offers to all of them, significantly underbid the market for some, and could not provide adequate client services or products to others. Advisers who went elsewhere were told they had "voluntarily" "resigned" and lost all their deferred compensation, while RMs who accepted an offer were required to sign an agreement acknowledging that they had "voluntarily" "resigned," surrendering a portion of their deferred compensation, and, in light of its serious misconduct, giving Credit Suisse a complete waiver and release. Credit Suisse, meanwhile, profited either way: On RMs who did not go to Wells Fargo, it saved nearly $200 million; on RMs who did, it received referral fees from Wells Fargo and loan repayments from RMs that almost entirely offset

the approximately $44.6 million in "Onboarding Awards" it owed RMs who joined Wells Fargo.

6.      In order to induce RMs to leave for Wells Fargo or other firms, Credit Suisse told them these were their only options.  On October 21, 2015, Philip Vasan, the head of the private bank, announced to the RMs that they would receive Onboarding Awards, a 5-10% discount on their outstanding deferred compensation, if they "resigned" and joined Wells Fargo and that "anything else is a voluntary resignation to a competitor."  Claimants and their fellow RMs understood this to mean, and Phil Vasan has subsequently testified that it meant, the only options were resign, join Wells Fargo and receive "replacement" deferred compensation or join any other firm and forfeit deferred compensation.  Credit Suisse then deliberately withheld termination dates from its RMs and withheld the actual date it was required to exit the US wealth management business from both its RMs and its clients, decisions that are otherwise inexplicable.

7.      For the same reason, Credit Suisse deliberately set an arbitrary December 7, 2015 deadline to decide on Wells Fargo, an untenably short window, and told its RMs that if they determined Wells Fargo was not suitable "it's a free country."  This drove approximately 100 RMs to join other firms by December 7, 2015.  It is the same reason Credit Suisse considered exiting the Protocol for Broker Recruiting, on a timeline that was tethered to its eventual disclosure of termination dates: Credit Suisse considered announcing an exit to the Protocol in early December, mid-December, January and February; in every case, the date of actual exit, by which all RMs would have to have left to retain the protections of the Protocol, was the day before Credit Suisse planned to finally disclose termination dates to the RMs.

8.      It is the same reason Credit Suisse waited four months, until mid-February 2016, to finally disclose termination dates to its RMs and the date it was fully closing to clients, by

which time only 28 RMs with deferred compensation were left.  And it is the same reason that when Credit Suisse finally told these 28 remaining RMs Credit Suisse would be out of the business by March 31, it told them they would have to stick around until May 31 or, in some cases, August 27.  This inexplicable 60-180 day garden leave drove 22 more RMs, who had remained at Credit Suisse to the very end, to leave before the lights were turned off and their clients were left completely without wealth management services.

9.      Credit Suisse's top secret "acceleration" policy was never disclosed to Claimants, and several were expressly told by Meaghan Diop, who represented human resources on the Project Light Executive Committee, that there was no alternative to serving a garden leave.  It apparently wasn't disclosed to their colleagues either.  Out of 294 RMs who were owed deferred compensation on October 20, 2015, and the 28 who remained to the end, six received it.  Even then, more than 90% of the net deferred compensation went to a single RM.  Two owed a combined $1.65 million on promissory notes, which was a million dollars more than they were owed.  One was owed approximately $60,000.  Another received 13 shares.  The other 288, meanwhile, were owed more than $240 million.  22 received termination agreements and were, Credit Suisse contends, aware of an "acceleration" policy that would have allowed them to leave on March 31, 2016, collect 100% of their deferred compensation and work free and clear for another firm on April 1 but chose, inexplicably, to leave a couple weeks early.

10.      Credit Suisse's own documents and the testimony of its own executives have established conclusively that none of this was a coincidence.  Credit Suisse deliberately structured the closure of its US Private Bank, made material misrepresentations to its advisers, failed to disclose material information, imposed a purposeless garden leave, and failed to disclose, and in certain cases affirmatively concealed, the purported "acceleration" policy in an

attempt to evade its deferred compensation liabilities.  In that sense, it succeeded.  Out of a $245 million liability, Credit Suisse ultimately paid a net $13.9 million,[1] only $2 million of it pursuant to the Award Certificates it drafted and issued to its employees year after year.

11.    Credit Suisse chose to exit Claimants' line of business.  Like any employees whose employer goes out of business, Claimants were entitled to the compensation they had already earned. They were also free to find another job. Had Credit Suisse behaved like a responsible FINRA member firm, observed the just and equitable principles of trade, honored its contractual obligations, and obeyed the laws of the States of New York and Illinois, this is what would have happened and  none of the dozens upon dozens of arbitrations now being brought against it would be necessary.  But on its way out, Credit Suisse breached its contractual obligations to Claimants, lied to them, strung them along for months, strung their clients along for months, demanded that they choose between their compensation and their clients and businesses, submitted false U-5s to FINRA, refused to pay them their earned compensation in violation of the New York Labor Law ("NYLL") and Illinois Wage Act, and attempted to deprive them of their right to arbitrate in this  forum, prompting FINRA to issue a regulatory notice.[2]

12.    This is a simple case: Credit Suisse entered into an employment agreement with Claimants pursuant to which it owed them compensation.  Claimants fully performed according to its terms and earned their compensation. Credit Suisse refused to pay them. It should pay them now, with the costs, attorneys' fees, prejudgment interest, and liquidated damages that are required by the NYLL and Illinois Wage Act.

---

[1] Four FINRA Arbitration Panels, all of the panels to have reached award thus far, have subsequently ordered Credit Suisse to pay another $5 million of it, excluding interest, attorneys' fees and liquidated damages under the New York Labor Law.

[2] Credit Suisse's Employment Dispute Resolution Program ("EDRP") required its employees to submit to JAMS  arbitration.  On July 16, 2016, FINRA issued Regulatory Notice 16-25, which effectively  eliminated the EDRP.

## PARTIES

**Claimants**

13.     Mark Christopher Hutchinson (CRD No. 1617486) received his undergraduate degree from DePaul University in 1987 and his MBA from Notre Dame.  Prior to graduation, he joined Lehman Brothers in 1985 as a part-time employee.  Upon graduation, he became a broker at Lehman Brothers where he remained for ten years, developing a retail business involving High Net-Worth ("HNW") clients and an institutional business comprised of hedge funds and registered investment RMs.  He subsequently joined Smith Barney, where he remained until 2010, when he joined Credit Suisse.  He is a chartered financial analyst and was a president of the CFA Society of Chicago.

14.     Paul Vanden Heuvel (CRD No. 2798766) received his MBA from Cornell University in 1996.  He spent more than four years with Donaldson, Lufkin & Jenrette ("DLJ") focusing on the ultra-high-net-worth ("UHNW") market before Credit Suisse First Boston acquired DLJ in 2001.  He registered with Credit Suisse in January 2003, where he built relationships with UHNW families and provided comprehensive wealth management services, including trust and estate planning and philanthropic strategies.  Mr. Vanden Heuvel's clients are sophisticated investors who require a level of service, global research and access to products available at only a handful of banks, including Credit Suisse, UBS and Morgan Stanley.  Mr. Vanden Heuvel was one of less than a dozen RMs at Credit Suisse who were selected and volunteered to develop a practice management program that provided mentoring and guidance to young advisors.  Mr. Vanden Heuvel was a member of Credit Suisse's Chairman's Club, a group of Credit Suisse's highest earning producers.

15.     Michael Board (CRD No. 5135712) received his Master's in Applied Finance and Economics from Southern Illinois University in 2007.  He began his career in 2010 at Morgan Stanley.  He later moved to Merrill Lynch before joining Credit Suisse Securities (USA) LLC in 2013 in the Northbrook branch office, where he built relationships with UHNW clients.  Mr. Board's clients were sophisticated investors who required access to products such as structured derivative notes and alternative investments.

16.     James Kelly (CRD No. 4362408) graduated from the University of Wisconsin – Madison, with a degree in Economics.  After spending several years in Africa doing volunteer work, he returned to the United States and began working at Morgan Stanley in 2001 as a Financial Advisor, where he met David Hirsch, his current partner.  He spent more than eight years at Morgan Stanley before joining Credit Suisse in 2008.  By 2015, Mr. Kelly's clients were invested in private equity, as well as structured notes, with another 25-30 percent of his gross production derived from the Yield Enhancement Strategy ("YES"), an option-overlay strategy at Credit Suisse.

17.     David Hirsch (CRD No. 1341777) earned his MBA from Northwestern University in 1991.  He spent more than 23 years with what began as Shearson American Express and Morgan Stanley, where he met his partner James Kelly, before joining Credit Suisse Securities (USA) LLC in February 2008.  At Credit Suisse, Mr. Hirsch's clients were primarily high-net-worth ("HNW") or ultra-high-net-worth ("UHNW") investors.

18.     James Whitney (CRD No. 2306063) graduated from DePaul University in 1984, where he also received his MBA.  He spent three years at ABN LaSalle, where he worked under Peter Frye, an investment advisor servicing clients including the Louis Family.  Eventually, he moved on to Harris Investment Management.  After leaving ABN LaSalle, Mr. Frye contacted

Mr. Whitney about opening a family office business.  They were ultimately able to secure the Louis Family as their flagship family and opened Frye-Louis Capital Management, Inc. ("Frye-Louis") in 1992.  Suisse purchased Frye-Louis in 2001 and Mr. Whitney went on to work for Credit Suisse for fourteen years, generating tens of millions of dollars in production and serving as a Managing Director and member of the Managing Director Evaluation Committee.

19.    Mary DiChristofano (CRD No. 4337963) graduated from Loyola University in 1988 with a degree in Finance.  She then spent four years at ABN LaSalle, where she worked until founding Frye-Louis in 1992.  She moved to Credit Suisse after its purchase of Frye-Louis in 2001.  She is a Certified Financial Planner and member of the Chicago Estate Planning Council and the Financial Planning Association.  She currently sits on the Morgan Stanley Private Wealth Management Advisory Council.

20.    Michael Sakach (CRD No. 1628485) graduated from Augustana College in 1985 with a B.S. in Economics and Business Administration.  He received his MBA from Northern Illinois University in 1986.  He spent his early career at the Chicago Board Options Exchange before moving to Harris Investment Management.  In 1993, he joined Frye-Louis and later moved to Credit Suisse when it purchased Frye-Louis in 2001.  He is a Chartered Financial Analyst, a member of the Investment Analyst Society of Chicago, and a member of the Economics Club of Chicago.

**Respondent**

21.    Credit Suisse (CRD No. 816) is the US subsidiary of Credit Suisse Group AG, a multinational financial services holding company based in Zurich, Switzerland.

### JURISDICTION

22.    "A dispute must be arbitrated under the Code if the dispute arises out of the business

activities of a member or an associated person and is between or among ... Members and Associated Persons." FINRA Rule 13200(a).

23.    Credit Suisse is a FINRA member firm. Claimants were at all relevant times "Associated Persons" pursuant to FINRA Rule 13100(r) and employees of Credit Suisse. This dispute arises from their employment.

## STATEMENT OF FACTS

### Credit Suisse

*Project Light*

24.    In late July 2015, Credit Suisse's new Chief Executive Officer Tidjane Thiam directed the Head of Credit Suisse Americas and Co-Head of Global Private Wealth, Robert Shafir, to sell or close US Private Bank.

25.    In late July 2015, Credit Suisse withdrew multiple recruiting offers and suspended recruiting. This immediately became public knowledge and was understood in the industry to confirm that Credit Suisse was closing or selling the US Private Bank.

26.    In internal e-mails, Credit Suisse executives, including Thiam, Shafir and Vasan, recognized that the rumors were damaging the business and broker morale. Shafir instructed his subordinates to "stall" by telling brokers and the public they were engaged in a "strategic review" and that no decisions had been made.

27.    The "strategic review" was a fiction intended to "buy time" and preserve whatever value US Private Bank had to potential buyers. In litigation, however, Credit Suisse has deployed the "strategic review" as though it were real in order to argue that Credit Suisse did not decide to close US Private Bank in July 2015.

28.    Between August 19 and August 21, the Credit Suisse Board met, considered the

options for "Project Light" and decided to close the business.  A press release set October 20, 2015 as the date Credit Suisse would announce the outcome of its "strategic review."  Internally, this was understood as a hard deadline to announce the closure of US Private Bank.

29.    The closure of US Private Bank was codenamed "Project Light" and was directed by a "Steering Committee," consisting of senior executives at Credit Suisse Americas and Credit Suisse AG and chaired by Shafir, and an Executive Committee, consisting of various executives and managers from US Private Bank, Human Resources, Global Compensation, Account and Control, and other relevant Credit Suisse departments.

30.    The Head of US Private Bank, Philip Vasan, and his deputy, Padman Perumal, managed Project Light.

31.    US Private Bank was not an independent legal entity but a division of Credit Suisse Securities (USA) LLC, which also operated Credit Suisse' US investment bank.  As Credit Suisse did not intend sell Credit Suisse Securities and the investment bank, Credit Suisse determined by no later than mid-August 2015 that US Private Bank could not be sold.

32.    Credit Suisse explored asset sales with several potential buyers, including Morgan Stanley, codenamed "Alpha," and Wells Fargo, codenamed "Beta."  Credit Suisse failed to find a buyer.

33.    The Project Light Executive Committee considered several other alternative structures for the "disposal" of US Private Bank, including spinning it off as a standalone entity or bringing in a private equity firm.  Like a sale or asset sale, these alternative structures proved unfeasible.

34.    No later than September 2015, Credit Suisse had narrowed its options to two scenarios: (1) An "exclusive recruiting agreement" with Wells Fargo or (2) a "wind down," i.e.,

a closure with no ancillary transaction. Credit Suisse estimated the cost of closure under the Wells Fargo scenario would be more than off-set by referral fees, promissory note repayments, and revenues generated by various product and services agreements between Credit Suisse and Wells Fargo. Credit Suisse estimated the cost of closure under the "wind down" scenario would be $320 million, including an "additional $76 million" for deferred compensation liabilities.

35.     No later than September 10, 2015, Shafir informed Thiam that Wells Fargo was likely to be Credit Suisse' partner in the "exclusive recruiting" transaction. Credit Suisse and Wells Fargo executed the "Broker Referral Agreement" on October 20, 2015.

36.     In both initial conception and execution, the "exclusive recruiting agreement" was nothing but a referral deal giving Wells Fargo preferential access to Credit Suisse' employee and client information, offices and brokers. Wells Fargo did not acquire any asset or liability of Credit Suisse. Credit Suisse has admitted, and communicated to the RMs, that the RMs had no contractual or legal obligation to join Wells Fargo.

37.     The lynchpin of the Wells Fargo "exclusive recruiting agreement" was Credit Suisse' outstanding deferred compensation liabilities, which Credit Suisse would pay only to brokers who joined Wells Fargo.

***Deferred Compensation***

38.     In September 2015, Credit Suisse calculated its outstanding unvested deferred compensation liabilities were $245 million.

39.     Credit Suisse issued deferred compensation "Award Certificates" to its brokers. The Award Certificates govern the terms of vesting, including specifically vesting in the event of termination:

4.        Termination of Employment Prior to Settlement Date.

(a) Resignation.

**If, prior to a Settlement Date, your employment with the Group terminates as a result of your resignation (other than Normal Retirement or a Special Resignation), (A) any then unvested Phantom Shares shall be cancelled immediately** and (B) any then vested Phantom Shares shall remain outstanding and shall settle for Registered Shares on the applicable Settlement Date in accordance with, and subject to, the terms and conditions set forth in the Plan Documents; provided, however, that if, at any time prior to the applicable Settlement Date, you resign and you fail to provide the Group with the Required Notice, any Phantom Shares that vested on the most recent applicable Scheduled Vesting Date that have not been settled shall be cancelled immediately.

\*\*\*

(d)  Termination Without Cause or Due to Your Disability.

If, prior to a Settlement Date, **your employment with the Group is terminated by the Group without Cause or due to your Disability, any then unvested Phantom Shares shall immediately vest** and all then vested Phantom Shares shall settle for Registered Shares on the applicable Settlement Date on which they would have settled pursuant to Section 3 had you remained employed and continued to vest in the Phantom Shares on the Scheduled Vesting Date, in accordance with, and subject to, the terms and conditions set forth in the Plan Documents.

Hr. Ex. 238, at Credit Suisse 13142-13143 (emphasis added).

40.    Credit Suisse was aware that closing US Private Bank would vest its outstanding unvested deferred compensation liabilities.  On August 13, 2015, Perumal wrote to various staff tasked with calculating the costs of closing US Private Bank, including deferred compensation

costs: "Since we will be exiting the US business RMs will most likely vest their deferred comp at Credit Suisse and will not use the makewhole allowance at the competitor's firm."

41.     Credit Suisse initially calculated the cost of immediately vesting 100% of the outstanding deferred compensation, as Mr. Perumal recognized was required by the Award Certificates.  Several weeks later, it calculated the cost of forfeiting 100% of the outstanding deferred compensation, in breach of the Award Certificates.

42.     Throughout September and October 2015, Credit Suisse explicitly compared the relative costs of breaching the Award Certificates and complying with them: "The nature of the transaction leaves two potential options to handle RM deferred comp, each with economic and legal risk."



43.     Credit Suisse estimated Option 1 would require a $69 million litigation reserve,

equaling exactly the $69 million additional deferred compensation expense of Option 2.

44.    Credit Suisse executives were highly concerned about the litigation risk. Internally, they recognized that Option 1 "increases risk and cost exposure to resigning RMs."

45.    This risk extended even to brokers who did agree to join Wells: "RM deferred compensation and severance: RMs may demand accelerated vesting of their deferred compensation and severance."  *Id.*  Because it could not terminate and accelerate the deferred compensation of RM who joined Wells Fargo without terminating and accelerating the deferred compensation of its other RMs, Credit Suisse determined that "Transaction must be communicated as a 'voluntary transition.'".  In other words, whether an RM joined Wells Fargo or another firm, Credit Suisse took the position that he or she "voluntarily resigned" and cancelled the outstanding deferred compensation.

46.    Credit Suisse understood that the "voluntary transition" communication was critical to its attempt to evade its deferred compensation liabilities.  It could not involuntarily terminate brokers who joined Wells Fargo because it knew, and explicitly acknowledged, that brokers who did not join Wells Fargo and were deemed to have "voluntarily resigned" would file claims for their deferred compensation based upon a "theory of constructive termination."  Credit Suisse could not possibly defend these claims after involuntarily terminating a third of its brokers—those who agreed to join Wells Fargo—in late 2015 and January 2016.

47.    For those brokers who joined Wells Fargo, Credit Suisse converted outstanding deferred compensation into an "Onboarding Award."  The "Onboarding Award" consisted of a slightly discounted amount for unvested deferred compensation other than "undetermined" back-ends, an arbitrarily 50% discounted amount for 2015 deferred compensation, and an amount for ISWAP.  It was paid in cash deferred over a four-year period.

48.    Credit Suisse made no provision for RMs who joined other firms.  It simply cancelled their outstanding deferred compensation.  This includes all of the Claimants, regardless of when they left Credit Suisse.

49.    Wells Fargo, which assumed none of Credit Suisse' deferred compensation liabilities or employment contracts, was so concerned about its own litigation risk and exposure to Credit Suisse RMs who were deemed to have "resigned" and forfeited their deferred compensation that it insisted upon an indemnification provision in the Broker Referral Agreement expressly covering "constructive termination" claims.

50.    Credit Suisse' CEO was still choosing between these two options on October 19, 2015.  Ultimately, Credit Suisse chose Option 1.

***Closure of US Private Bank, October 20 – December 7 2015***

51.    As late as the morning of October 20, 2015, Shafir presented Thiam with two possible press releases.  One announced the deal with Wells Fargo; the other announced that US Private Bank was closing.

52.    On October 20, 2015, Credit Suisse announced it was closing US Private Bank. On October 21, 2015, Credit Suisse introduced Wells Fargo to its brokers and told the brokers they would receive their deferred compensation, in the form of an "Onboarding Award," if they agreed to resign and join Wells Fargo.  "Anything else" would be a "voluntary resignation to a competitor."

53.    These were the only two options.  At no time between October 20, 2015 and mid-February, 2016 did Credit Suisse disclose a "third" option to be terminated and receive acceleration of deferred compensation; the March 31, 2016 date Credit Suisse was required to cease competing in the US wealth management business pursuant to the Broker Referral

16

Agreement.   This information was "embargoed" by firm policy for the purpose of compelling the brokers to join Wells Fargo or leave for another firm as soon as possible.

54.    Mr. Vasan's communication on October 21, 2015 that "anything else" would be a "voluntary resignation to a competitor" was deliberate and calculated to communicate to brokers that they would receive their deferred compensation only if they agreed to join Wells Fargo.

55.    During the October 20, 2015 announcement, Shafir and Vasan set a December 7, 2015 deadline to commit to Wells Fargo.  This date was set by Credit Suisse, which insisted upon maintaining it even after Wells Fargo repeatedly requested extensions because no brokers had committed to Wells Fargo as of December 2, 2015.

56.    Internal e-mails between December 1 and December 7 explicitly state that the December 7 date was critical to Credit Suisse and that no extension of the deadline would be agreed to or publicly announced.

57.    While brokers were ultimately permitted to join Wells Fargo after this date, Credit Suisse deliberately (a) chose not to announce that the deadline would be enforced and (b) refused to communicate to RMs and clients what would happen after December 7, 2015.  The express purpose of these decisions was to pressure brokers to either commit to Wells Fargo or leave the firm prior to December 7, 2015.

58.    Credit Suisse calculated 2015 deferred compensation in November and December 2015.  It totaled almost $50 million, which would have been "granted" in mid to late January 2016.  2015 deferred compensation, with an arbitrary discount, was included in the Onboarding Awards, while virtually all of the remainder was ultimately cancelled by Credit Suisse.

59.    Credit Suisse set and maintained a December 7 deadline, notwithstanding that its brokers and managers and Wells Fargo clearly communicated that this date was unfeasible, for

the purpose of driving as many RMs out of Credit Suisse prior to the mid-late January "grant date" for 2015 awards.

60.     Credit Suisse also planned to announce its exit from the Protocol for Broker Recruiting on December 8, 2015, or the day after the December 7 deadline.  RMs would then have until January 18, 2016 to leave for other firms under the protections of the Protocol, which would have resulted in every RM leaving by January 18, 2016.  On January 19, 2016, Credit Suisse would finally disclose its "planned termination approach" to the "remaining RMs."  Even then, Credit Suisse planned to impose a garden leave: "Remaining RMs will not be able to provide full services to their clients as of the March 31 non-compete start date, but would not be able to join new firm and ACAT out their clients till after April 18 termination date."[3]

61.     Claimant Hutchinson served primarily institutional clients.  At least 40% of his business could not have transferred to Wells Fargo and Robert Sierens, his branch manager, admitted that this made Wells Fargo "impossible" for Hutchinson.

62.     Having concluded that he would not join Wells Fargo, and pursuant to the direction of Shafir and Vasan, Hutchinson left for UBS on November 3, 2016.  Credit Suisse deemed his involuntary termination a "voluntary resignation," reported that termination was "Voluntary" in its Form U5 filing with FINRA, and cancelled his outstanding deferred compensation and failed to pay severance.

63.     As of December 8, 2015, 108 brokers had left Credit Suisse for other firms. Credit Suisse deemed their involuntary terminations "voluntary resignations," reported that

---

[3] As set forth below, the "January 19, 2016 communication date" was ultimately postponed to mid-February 2016.  Claimants Hirsch, Kelly, Board, Whitney, Sakach, and DiChristofano were at Credit Suisse when the Notices of Termination were finally set.  Claimants' Hirsch, Kelly, and Board's "termination date" was May 31, 2016.  Claimants Whitney, Sakach and DiChristofano's "termination date" was August 27, 2016.

termination was "Voluntary" in its Form U5 filings with FINRA, and cancelled their deferred compensation.  Credit Suisse has subsequently been ordered to amend the Form U5 filings for two brokers to state that they were "terminated without cause" on December 18, 2015 and March 16, 2016, respectively.

***Closure of US Private Bank, December 8, 2015 – March 18, 2016***

64.    After four months of purposefully maintaining complete silence, on February 19, 2016 Credit Suisse sent a perfunctory mass letter to clients instructing them to "contact us as soon as possible, but no later than 31 March 2016, to provide instructions regarding the closure of your above-referenced account(s) and transfer of your assets":

> You may now be aware that Credit Suisse announced in October 2015 an exclusive recruiting arrangement with Wells Fargo to provide Relationship Managers and their clients in Credit Suisse's U.S. Domestic Private Banking business an opportunity to transition to Wells Fargo's brokerage business, Wells Fargo Advisors, by early 2016.
>
> **In conjunction with the foregoing, Credit Suisse has decided to exit the Private Banking business in the U.S. by March 31, 2016. After this date, Credit Suisse will no longer offer private banking or wealth management services and will wind-down all current product offerings and client relationships. This means that after March 31, 2016 Credit Suisse will no longer provide brokerage or investment advisory services or provide any investment advice to your account(s). Rather, we will only take instructions from you with regards to liquidation of your account assets and transfer of your account(s).**
>
> **Please contact us as soon as possible, but no later than 31 March 2016, to provide instructions regarding the closure of your above-referenced account(s) and transfer of your assets**. Please note a) you may be charged certain customary termination and/or transfer fees, as referenced in your account documentation and b) certain investment advisory strategies, as referenced below, require longer notice periods.

***

**If you have any Investment Advisory Accounts**

If any of the above referenced accounts are investment advisory accounts, **we are hereby terminating all client services and investment advisory agreements that you have entered into with Credit Suisse Securities (USA) LLC ("Credit Suisse") for any investment advisory programs**, which may include but are not limited to the list below, effective March 31, 2016. Accordingly, if the availability of investment advice is important to you, we encourage you to take prompt steps to consider alternative investment RMs to assist you after March 31, 2016.

**After March 31, 2016, your investment advisory account(s) will revert to a self-directed brokerage account(s) and Credit Suisse will no longer act as an investment RM and/or discretionary portfolio manager over those assets. The Terms & Conditions in your New Account Agreement shall govern your brokerage account.** Trades will be executed only upon your specific instruction, in accordance terms of the New Account Agreement. Pro-rated investment adjustment of advisory fees will be reflected where applicable and, going forward, you will be charged a commission for each transaction in such account rather than an investment advisory fee. Details on commissions and other terms governing your brokerage account are included in the Terms & Conditions packet you received at the time your account was opened, as the same may have been amended. A copy of this document is also available upon request. For ERISA clients, please also refer to the 408(b)(2) disclosure which can be found at: https:/ /www.credit-suisse.com/media/pb/doCredit Suisse/us/privatebanking/approach/brokerage-account-disclosures.pdf

Hr. Ex. 2183, at Credit Suisse 42448-42449 (emphasis added).

65.     Claimant Vanden Heuvel saw a draft of this letter in mid-February 2015.  He left for UBS on February 16, 2016.  Credit Suisse deemed his involuntary termination a "voluntary resignation," reported that termination was "Voluntary" in its Form U5 filing with FINRA, and cancelled his outstanding deferred compensation and failed to pay severance.

66.     Around the same date, Credit Suisse notified the remaining Claimants Hirsch, Kelly, Whitney, Sakach, DiChristofano, and Board of its "Special Termination Program In

Connection With the February 2016 U.S. Reduction In Force." Each of the remaining Claimants received a "Notice of Termination," which did not characterize Claimants' terminations as voluntary:

> Regrettably, due to current business conditions, your employment with Credit Suisse (or the Credit Suisse subsidiary by which you are now employed) **will be permanently terminated on the date indicated in Attachment 3 hereto as your Employment Termination Date.**

*Id.* at Credit Suisse 0008019 (emphasis added). The "Notice of Termination of Employment" contained additional notifications required by the WARN Act, a federal statute that requires certain employers to provide advance notice and other rights to employees terminated as part of a "mass layoff":

> **We are giving you this advance notice of the termination of your employment to provide you with an opportunity to begin to formulate your plans for your future** and, to the extent such laws may apply, in compliance with the WARN Act and any applicable state law. These laws and regulations **require employers, in certain circumstances, to provide formal notice to employees who will experience a loss of employment due to what the law defines as a 'mass layoff.'** This notice is also in lieu of any other notice that you might otherwise be entitled to receive under any policy or practice that might otherwise apply in these circumstances.

*Id.* (emphasis added).

67. For each Claimant, the "Last Date of Active Employment" was March 31, 2016, the same day Credit Suisse was required to cease all US wealth management activities pursuant to the Broker Referral Agreement, which had been executed on October 20, 2015. The "Notice of Termination" was Credit Suisse's first disclosure of this date, which it had deliberately concealed for four months.

68. The "Employment Termination Date" for Claimants Hirsch, Kelly and Board was

May 31, 2016.  Combined with the non-solicitation period, this would have left these Claimants' clients without wealth management services for four months.

68.    The "Employment Termination Date" for Claimants Whitney, Sakach and DiChristofano was August 27, 2016.  Combined with the non-solicitation period, this would have left these Claimants' clients without wealth management services for seven months.

70.    At the same time, pursuant to the "Special Termination Program In Connection With the February 2016 U.S. Reduction In Force," Credit Suisse sent Claimants a "Termination Agreement Containing A General Release and Waiver."  The Termination Agreements, which also contained a WARN Act notification, would have required Claimants to waive their contractual and statutory rights, give Credit Suisse a general, and non-mutual, release, and agree to a 60 day non-solicitation period.  Id. at Credit Suisse 0008014, ¶ 12.   In the case of Claimants Whitney, Sakach and DiChristofano, this waiver would have included their Wage Act claims for Credit Suisse's unlawful deferral of their 2014 and 2015 commissions.

71.     Credit Suisse included the "garden leave" and "non-solicitation" periods for the sole purpose of compelling its remaining brokers to leave.

72.    Claimants were never notified of an "acceleration" policy permitting them to leave on March 31, 2016, receive 100% of their deferred compensation and join a new firm free and clear on April 1, 2016.  It is self-evident that such a policy would have materially affected their decision to leave prior to March 31, 2016.

73.    Without disclosure of the "acceleration policy," Claimants had no reason to remain at Credit Suisse and every reason to leave as soon as possible, including the strong urging of Sierens, their branch manager, the time and complexity of the ACAT process, and Credit Suisse's stated intention to convert their clients' investment advisory and wealth management

accounts to self-directed brokerage accounts on liquidation-only restrictions on March 31, 2016.

74.     Beginning April 1, 2016, and for 2-5 months thereafter, Claimants would have been prohibited from contacting their clients.  They would have had no access to Credit Suisse' computer systems or their offices, no ability to service their clients and no ability to help their clients transfer to functional firms.  In order to transfer, their clients would have to have found new brokers.  This would have both severely disserved Claimants' clients and destroyed their business, which is, of course, why Credit Suisse imposed the otherwise inexplicable "garden leave" period.

75.     Claimants Hirsch and Kelly joined UBS on March 11, 2016.  Credit Suisse deemed their involuntary terminations "voluntary resignations," reported that termination was "Voluntary" in its Form U5 filings with FINRA, and cancelled their outstanding deferred compensation and failed to pay severance.

76.     Claimants Board, Whitney, Sakach, and DiChristofano joined Morgan Stanley on March 18.  Credit Suisse deemed their involuntary terminations "voluntary resignations," reported that termination was "Voluntary" in its Form U5 filings with FINRA, and cancelled their outstanding deferred compensation and failed to pay severance.

77.     The success of Credit Suisse's "garden leave" and "non-solicitation" periods, and deliberately failure to disclose its "acceleration policy," was not limited to Claimants.  Of the 35 RMs who received the Notice of Termination, 6 signed the release.  Their net outstanding deferred compensation was approximately $2 million, the overwhelming majority of which was owed to a single broker.

78.     Of the $245 million in outstanding unvested deferred compensation liability Credit Suisse recognized would vest when it closed US Private Bank, Credit Suisse paid out

approximately $2 million pursuant to its contracts.  Including referral fees and promissory note repayments required under its agreements, Credit Suisse's net deferred compensation payment on all brokers, including those who joined Wells Fargo, was $13.9 million.

**Claimants**

79.     Claimants were commission salespeople.  Each month, Claimants received a split of the revenue they generated for Credit Suisse and a draw against commissions.

80.     Pursuant to the RM Compensation Guide, commissions were calculated on a grid that provided the RM's split of production based upon (i) length of service; (ii) year to date gross production divided into eight tranches, ranging from less than $250,000 to more than $4 million; and (iii) product group, including fee-based business, transactional (i.e., commission-based) business and syndicate business.  For RMs with length of service greater than five years, which includes all of the Claimants, the commission rate ranged from 15% to 48%.

81.     Pursuant to the RM Compensation Guide, commissions were partially deferred each month in the form of deferred award credits, which were governed by the Credit Suisse Group AG Master Share Plan and Credit Suisse AG Group Master Share Plan Award Certificates.

82.     Deferrals were taken only after the RM earned a certain amount in commissions, the "Cash Only Threshold."  Both the "Cash Only Threshold" and deferral rates were based upon title.  Each of the Claimants was either a Director or Managing Director.  For Directors, the "Cash Only Threshold" was $250,000 and the deferral rate was 15%.  For Managing Directors, the "Cash Only Threshold" was $450,000 and the deferral rate was 20%.  As an example, a Director with net commissions of $1 million would not be deferred on the first $250,000.  A deferral rate of 15% would apply to $750,000, for a total of $112,500.

83.     Commissions and deferrals were reported to Claimants on monthly Production Reports and Earning Statements, which stated their earnings as "Sales Comm."

84.     Certain Claimants were also eligible for ISWAP, a deferral program that matched 100% of compensation an RM voluntarily deferred up to $125,000.

85.     Certain Claimants were also eligible for Elite and Growth Awards, which adjusted their split of production upward after they achieved production or growth targets.

86.     Claimants' deferred compensation awards were governed by the Credit Suisse Group AG Master Share Plan and Credit Suisse Group AG Share Plan Award Certificates.  The Certificates governed what would happen to "unvested" awards in the event of termination:

> 4.    <u>Termination of Employment Prior to Settlement D</u>ate.
>
> (a)  Resignation.
>
> **If, prior to a Settlement Date, your employment with the Group terminates as a result of your resignation (other than Normal Retirement or a Special Resignation), (A) any then unvested Phantom Shares shall be cancelled immediately** and (B) any then vested Phantom Shares shall remain outstanding and shall settle for Registered Shares on the applicable Settlement Date in accordance with, and subject to, the terms and conditions set forth in the Plan Documents; provided, however, that if, at any time prior to the applicable Settlement Date, you resign and you fail to provide the Group with the Required Notice, any Phantom Shares that vested on the most recent applicable Scheduled Vesting Date that have not been settled shall be cancelled immediately.
>
> ***
>
> (d)  <u>Termination Without Cause or Due to Your Disability.</u>
>
> If, prior to a Settlement Date, **your employment with the Group is terminated by the Group without Cause or due to your Disability, any then unvested Phantom**

> **Shares shall immediately vest** and all then vested
> Phantom Shares shall settle for Registered Shares on the
> applicable Settlement Date on which they would have
> settled pursuant to Section 3 had you remained employed
> and continued to vest in the Phantom Shares on the
> Scheduled Vesting Date, in accordance with, and subject
> to, the terms and conditions set forth in the Plan
> Documents.

Hr. Ex. 238, at Credit Suisse 13142-13143 (emphasis added).

87.     Claimants were involuntarily terminated or, in the alternative, constructively terminated on October 20, 2015.

88.     As set forth below, Credit Suisse's Credit Suisse's October 21, 2015 statement that RMs could either resign and join Wells Fargo, forfeiting their deferred compensation in exchange for Onboarding Awards, or resign and join a competitor, forfeiting their deferred compensation, was an anticipatory breach of Credit Suisse's contractual obligations to Claimants.

89.     In the alternative, Credit Suisse breached its contractual obligations to Claimants when it cancelled their deferred compensation, as set forth below.

90.      Claimants were entitled to severance under Credit Suisse's 2015 severance policy.  Credit Suisse breached its contractual obligations to Claimants when it failed and refused to pay severance.

**Claimant Mark Hutchinson**

*Deferred Compensation*

91.     By August 2015, Mr. Hutchinson was aware of the rumors and press surrounding Credit Suisse's plan to sell its U.S. Private Bank.  He spoke with Jim Walker, the COO of the US Private Bank, who confirmed that the business was being closed or sold but assured him that they were going to try to "keep the band together."  At around the same time, Mr. Hutchinson

was told by a colleague in equity research that his division had already been instructed not to expend resources on the U.S. Private Bank because it was being sold.

92.     In September 2015, Mr. Hutchinson met with representatives from Wells Fargo in Chicago and St. Louis.  During these meetings, Mr. Hutchinson learned that Wells Fargo could not support his institutional business because its institutional broker-dealer was a separate entity. As institutional clients made up 40-50% of his business, this made Wells Fargo impossible, as Mr. Sierens and others in Credit Suisse management acknowledged.

93.     Mr. Hutchinson understood the October 20, 2015 announcement to mean that "we are shutting down this unit, and you are all going – you can either go to Wells Fargo or you can go someplace else."  That same day, Mr. Hutchinson spoke with Rich Jaffe, the Co-Chairman of Investment Banking at Credit Suisse, and told him that "you are selling the greatest sales force in the world to the junior varsity."  Mr. Jaffe agreed.  Mr. Hutchinson was also concerned about the December 7, 2015 deadline to make the decision to join Wells Fargo, as he knew that proper due diligence would take at least 90 days in order to make a decision about what's best for clients on a long-term basis.  He sought clarity on what would happen to the U.S. Private Bank on December 8, 2015 from Robert Sierens, his Branch Manager, and Meagan Diop in Human Resources and neither could provide him with definitive answers.

94.     On October 20, 2015, Mr. Sierens informed Mr. Hutchinson that he would be stripped of two of his institutional clients, which comprised approximately 40 percent of his production, and that they would be serviced out of the New York trading desk by the following Monday.  He raised this issue with Mr. Sierens, Mr. Walker and Mr. Jaffe, and no one was able to provide any concrete response as to why Mr. Hutchinson's institutional clients were taken away from him.

95.    Phil Vasan's statement that Credit Suisse would honor its deferred compensation obligations to RMs who joined Wells Fargo and that "[a]nything else is a voluntary resignation to a third-party" was the only statement Credit Suisse made to Mr. Hutchinson regarding the vesting of his deferred compensation.  This was a material misrepresentation.  Credit Suisse never disclosed to Mr. Hutchinson that: (a) he would be terminated as part of a reduction in force; (b) his date of termination would be May 31, 2016; (c) the last day he would be allowed to service his clients would be March 31, 2016; or (d) that Credit Suisse would vest and pay his deferred compensation under the Award Certificates.

96.    Mr. Hutchinson, having just met with Wells Fargo only a month before, did not attend Wells Fargo's pitch in St. Louis.  His view of Wells Fargo's inability to handle his business was confirmed by Mr. Sierens, who told him that "[i]t's a choice for some people.  It's not a choice for you."

97.    Mr. Hutchinson sought to remain at Credit Suisse, meeting with Stephen Simberg, the head of CS Chicago institutional sales, in the hope of joining his department.  Felipe Portillo from CS Equity and Neil Mitchell both were supportive of Mr. Hutchinson remaining at the Firm and made calls to Stephen Simberg to that effect.

98.    On October 27, 2015, Mr. Hutchinson made a final attempt to remain at Credit Suisse, reaching out to Mr. Walker to ask whether there was "[a]ny news or even any dialog[ue] on my staying here?"  He continued, "[p]lease let them know in Zurich that we want a do over!"  Credit Suisse ultimately told Mr. Hutchinson that it could not continue in the retail business because of the arrangement with Wells Fargo.

99.    On November 3, 2015, Mr. Hutchinson joined UBS.

100.    On December 1, 2015, Credit Suisse filed a Form U-5 for Mr. Hutchinson

notifying FINRA that he had been terminated and that his termination was "Voluntary."

101.    By letter dated November 10, 2015, Credit Suisse notified Mr. Hutchinson that his deferred compensation Awards were cancelled retroactively to November 3, 2015.

102.    As of November 3, 2015, Mr. Hutchinson had been granted 53,058 shares of Credit Suisse AG and $57,609 in cash awards, all of which vested immediately upon his termination without cause.

103.    As of November 20, 2015, Credit Suisse determined that Mr. Hutchinson's "Outstanding Deferred Compensation" was $1,596,831.  This consisted of Mr. Hutchinson's:

    i.    "2015 Outstanding Deferral"[4]: $1,383,002

    ii.    "2015 Credit Deferral": $120,753

    iii.    "2015 ISWAP": $62,503

    iv.    "2015 Elite/Growth @50%": $30,57

104.    Credit Suisse applied an arbitrary 50% haircut to its RMs' 2015 Elite and Growth Awards.  Mr. Hutchinson's actual 2015 Elite and Growth Awards were determined to be 61,146.[5]

105.    Credit Suisse's October 21, 2015 statement that RMs could either resign and join Wells Fargo, forfeiting their deferred compensation in exchange for Onboarding Awards, or resign and join a competitor, forfeiting their deferred compensation, was an anticipatory breach of Credit Suisse's contractual obligations to Mr. Hutchinson, resulting in damages of $1,627,399.84.

---

[4] Consisting of Mr. Hutchinson's 53,058 shares valued as of October 20, 2015 and $57,609 in cash awards.

[5] This amount was calculated pursuant to the RM Comp Guide.  For "Elite," Mr. Hutchinson received an additional 4% commission on production over $2 million and less than $4 million. For "Growth," Mr. Hutchinson received an additional 15% commission on new production over .5%.

106.    In the alternative, Credit Suisse breached its contractual obligation to Mr. Hutchinson when it cancelled his deferred compensation on November 3, 2015, resulting in damages of $1,606,707.22.[6]

107.    Mr. Hutchinson was entitled to severance of approximately $40,384 under Credit Suisse's 2015 severance policy.[7]

108.    Credit Suisse has failed and refused to pay Mr. Hutchinson in breach of its contractual obligations and in violation of the New York Labor Law or, in the alternative, Illinois Wage Act.

***Eurocastle Commission***

109.    On April 24, 2015, a client of Mr. Hutchinson purchased more than €100 million of an equity offering by Eurocastle Investment Ltd. underwritten by Credit Suisse International. Mr. Hutchinson's desk also handled the FX on the transaction to settle the trade.

110.    Mr. Hutchinson's client was the largest buyer in the transaction and the transaction generated approximately €6 million fees for Credit Suisse. CS only told Mr. Hutchinson after the transaction was settled that he wouldn't be paid pursuant to the policies and procedures that governed every other syndicate transaction for Eurocastle.

111.    Mr. Hutchinson was owed an $80,000 commission in cash, but Credit Suisse arbitrarily deferred the entire amount to a Single Global Currency Award ostensibly to paid February 15, 2016. They provided no documentation of the award and offered no explanation or contractual basis for this deferral.

112.    After Mr. Hutchinson was terminated without cause, Credit Suisse failed and

---

[6] $24.59 (11/03/15 CS share price) * 53,058 (outstanding shares) = $1,304,696.22 + $57,609 (cash award) = $1,362,305.22 + $244,402 (2015 Deferred).
[7] (Hypothetical Salary (Director)/52 weeks)*(Years in Service*(3 weeks per year))

refused to pay Mr. Hutchinson the Eurocastle Commission, either in cash or deferred compensation, in breach of its contractual obligations and in violation of the New York Labor Law or, in the alternative, Illinois Wage Act.

**Claimant Paul Vanden Heuvel**

*Deferred Compensation*

113.    Mr. Vanden Heuvel understood the October 20, 2015 announcement to mean that "the rumors that have been swirling for the past year are, in fact, true, and that the firm to which I dedicated my career was going away."

114.    Mr. Vanden Heuvel was also concerned about the December 7, 2015 deadline to make the decision to join Wells Fargo, as by that time Mr. Vanden Heuvel had a book of business worth approximately $500 million.  He was concerned that transferring such a large book to any new firm would involve expending significant time and resources, which he expressed in an email to Philip Vasan the very same day:

> Phil, It is a mistake to set the decision date at December 7th.  A little bit over one month is simply not enough time to enable us to continue to provide the high level of service that our clients expect, and also do the type of in-depth due diligence that would enable me to go back, look my clients in the eye, and tell them that Wells Fargo, or any other firm, is the very best home for them. That is bad stewardship, and I, for one, am not going start practicing bad stewardship with clients who depend on me to pilot their airplane to the best airport.  As an aside, I do have to tell you that Rob's comments imploring employees to stick around until year-end so that we can "hand these clients over to Wells" is really in bad taste and not the kind of professionalism that I have come to expect in my 20 years with this firm.

115.    Mr. Vanden Heuvel further expressed this sentiment in an e-mail to his entire Branch, imploring them to speak up:

> Team, [a]s I expressed in our meeting with the Wells Fargo

management group and Rich Jaffe yesterday, I, for one, do not believe that one month is going to give me sufficient time to both do my job as an advisor to my clients and do the type of the due diligence on the Wells Fargo platform that will enable me to tell my clients that it is the best solution for them going forward.  A process like this can certainly not go on indefinitely, but this feels extremely rushed, and that is not a conducive environment for making sound decisions.  If Credit Suisse and Wells Fargo truly care about our clients and about us, as they claim to do, then they will give us enough time to make a sound decision for our clients and for ourselves.  December 31st makes much more sense to me, and will provide us with at least two more weeks to complete a thoughtful and deliberate process. I am not going to move the needle with this process on my own – together, we might.  If you are in agreement, please make sure that you proactively reach out to Bob [Sierens], Rich [Jaffe] and Phil [Vasan] and let them know your thoughts.

116.    Phil Vasan's statement that Credit Suisse would honor its deferred compensation obligations to RMs who joined Wells Fargo and that "[a]nything else is a voluntary resignation to a third-party" was the only statement Credit Suisse made to Mr. Vanden Heuvel regarding the vesting of his deferred compensation.  This was a material misrepresentation.  Credit Suisse never disclosed to Mr. Vanden Heuvel that: (a) he would be terminated as part of a reduction in force; (b) his date of termination would be May 31, 2016; (c) the last day he would be allowed to service his clients would be March 31, 2016; or (d) Credit Suisse would vest and pay his deferred compensation under the Award Certificates.

117.    After the October 20 and 21 conference calls, Credit Suisse issued a press release, which Mr. Vanden Heuvel forwarded to his clients.  His clients were confused by the announcement and asked whether the business was being sold and whether Credit Suisse was exiting the U.S. private banking business.  Although Mr. Vanden Heuvel informed his clients that the transaction was not a sale of the business, he did confirm that Credit Suisse was exiting the business.  In response, several of his clients expressed dissatisfaction with Wells Fargo as a

32

counterparty to the transaction.

118.    Mr. Vanden Heuvel, along with many other RMs, attended a conference in St. Louis and spent time with senior Wells Fargo management to better understand its platform and offerings.  After the trip to St. Louis, Mr. Vanden Heuvel sent Wells Fargo management a list of due diligence items for which he needed further clarity.  Additionally, he inquired as to whether Wells Fargo was capable of onboarding WealthTouch, "a consolidated reporting tool used by one of [Mr. Vanden Heuvel's] largest clients [because this] is an extremely important component of this client relationship, and we are going to need clarity as to how we would deal with a transition to Wells for this client."  Mr. Vanden Heuvel never received an affirmative response to either inquiry.

119.    By January 1, 2016, Mr. Vanden Heuvel was "99 percent certain" that Wells Fargo would not be a fit for his clients for three primary reasons:

> The first is that among my clients, Wells Fargo did not have a reputation as being a presence in the global [UHNW] money management business; the second reason is that I did not believe that the people who would be in those critical support roles for our clients were the caliber that my clients had become accustomed to[]; and the last reason is that the product platform at Wells was not sufficient in a number of ways to support what my clients had come to expect.

In fact, Keith Vanderveen, a member of Wells Fargo's management who met with Mr. Vanden Heuvel in effort to recruit him, explicitly told him that "I don't understand your business."

120.    On January 13, 2016, Mr. Vanden Heuvel contacted Mr. Eastman and Mr. Sierens about his Deferral Award Credits for December 2015, expressing confusion about how Credit Suisse would vest the awards given its decision to close its U.S. Private Bank: "On my production report for December 2015 production […] it look[s] like Credit Suisse took $12,373.04 out of my earned income as a deferral award credit.  Was this intentional?  If so,

when does this earned but deferred income vest?"  Mr. Eastman's response was less than clear: "This was intentional, as well followed the 2015 Comp Guide for the whole of 2015.  These deferred credits are provided to exec comp, and would vest according to the CS Master Share plan.  The CS Master Share plan is set globally, and is the same for all employees, but it varies every year and I don't believe it has been set yet for this year."

121.    After the October 20 announcement, Credit Suisse's products and services began to deteriorate.  RMs and support staff were actively seeking employment elsewhere.  In one specific instance, when Mr. Vanden Heuvel needed to buy a municipal bond, his calls to the bond desk in the middle of the day went unanswered, which was unheard of in the UHNW marketplace.   Additionally, any long-term insurance and trust and estate planning, which comprised a large portion of Mr. Vanden Heuvel's business, was suspended given the impending closure of the U.S. Private Bank.

122.    On February 16, 2016, Mr. Vanden Heuvel left for UBS and submitted a protocol letter to Bob Sierens:

> In light of Credit Suisse's decision to exit the U.S. Domestic Private Banking and Wealth Management arena, the need for my clients to move their accounts, and the resulting termination of my position, please be advised that I have decided to accept a position with the Private Wealth Management division of UBS Financial Services effective immediately.

123.    Just before he left, Mr. Vanden Heuvel and other RMs were told that Credit Suisse would shortly be sending a letter to their clients informing them that:

> Credit Suisse has decided to exit the Private Banking business in the U.S. by March 31, 2016.  After this date, Credit Suisse will no longer offer private banking or wealth management services and will wind-down all current product offerings and client relationships.  *This means that after March 31, 2016 Credit Suisse will no longer provide brokerage or investment advisory services or provide any investment advice to your account(s).  Rather we*

> *will only take instructions from you with regards to liquidation of*
> *your account assets and transfer of your account(s).*

124.    On March 8, 2016, Credit Suisse filed a Form U-5 for Mr. Vanden Heuvel notifying FINRA that he had been terminated and that his termination was "Voluntary."

125.    By letter dated April 7, 2016, Credit Suisse notified Mr. Vanden Heuvel that his deferred compensation Awards were cancelled retroactively to February 16, 2016.

126.    As of February 16, 2016, Mr. Vanden Heuvel had been granted 40,448 shares of Credit Suisse AG and $104,161 in cash awards, all of which vested immediately upon his termination without cause.

127.    Credit Suisse's October 21, 2015 statement that RMs could either resign and join Wells Fargo, forfeiting their deferred compensation in exchange for Onboarding Awards, or resign and join a competitor, forfeiting their deferred compensation, was an anticipatory breach of Credit Suisse's contractual obligations to Mr. Vanden Heuvel, resulting in damages of $1,114,552.04.[8]

128.    In the alternative, Credit Suisse breached its contractual obligation to Mr. Vanden Heuvel when it cancelled his deferred compensation on February 16, 2016, resulting in damages of $652,635.88.[9]

129.    Mr. Vanden Heuvel was entitled to severance of approximately $105,000 under Credit Suisse's severance policy.[10]

130.    Credit Suisse has failed and refused to pay Mr. Vanden Heuvel in breach of its contractual obligations and in violation of the New York Labor Law or, in the alternative, the

---

[8] $24.98 (10/21/15 CS share price) * 40,448 (outstanding shares) = $1,010,391.04 + $104,161 (cash award).

[9] $13.56 (2/16/16 CS share price) * 40,448 (outstanding shares) = $548,474.88 + $104,161 (cash award).

[10] (Hypothetical Salary (Director)/52 weeks)*(Years in Service*(3 weeks per year))

Illinois Wage Act.

***Commission Trailers***

131.    Mr. Vanden Heuvel's clients invested in Strategic Partners.  Strategic Partners was a private equity fund and alternative investment that had historically been part of Credit Suisse asset management, but was reorganized after implementation of the Volcker Rule and relaunched by both Credit Suisse and the Blackstone Group.  When an RM's clients invested in Strategic Partners, they would pay a fee that would then be shared between Credit Suisse and the Blackstone Group.  Credit Suisse's share was then split with the RM.

132.    On November 18, 2015, Lisa Anne Siradas, a member of Mr. Vanden Heuvel's team, inquired as to the payment of commission trailers related to the Strategic Partners, which totaled more than $75,000, given the pending closure of the U.S. Private Bank.  She was told that Credit Suisse was "planning on holding a close in mid-late December.  You will be paid the first payment of the placement fee within 10 days of the close at the underlying fund level and the trailer payments are paid semi-annually.  And the client paid placement fee for the feeder pays out almost within days of the close."  She continued to follow up with Credit Suisse and was met with further obfuscation.

133.    On December 22, 2015, Mr. Vanden Heuvel sent an e-mail to Mike Isikow and Bob Sierens seeking further clarity on the payment of the Trailers owed from Strategic Partners and whether or not RMs will be required to be employed by Credit Suisse in order to receive them.  On January 6, 2016, Ashok Eastman informed Mr. Vanden Heuvel that "the best way to make sure you get credited with the SP VII fees (or any fees or transactions, for that matter) is to be an employee of CS when they hit."  Mr. Vanden Heuvel responded with concern:

> This seems to put RM's in a pretty difficult situation.  Since Credit Suisse intends to exit the private banking business, but

Relationship Managers need to stay employed by Credit Suisse to be certain to be paid on the fees that our clients have paid and we have earned, how does the firm intend to approach deferred compensation going forward?  Is the firm's intention to continue to take money out of our paychecks as deferred compensation in 2016?  If so, what does the firm intend to do with this income that we have earned, but will not have the ability to recoup since CS is closing the business?

134.   On January 27, 2016, Mr. Vanden Heuvel sent another email to Mr. Isikow expressing concern "that we still have not seen the client-paid placement fees for this fund hit our commission run.  Do you have any sense as to when we will see them?  There are only two business days remaining in the month."  That same day, Mr. Isikow assured him that "CS has received the cash and our operations/payment team is currently processing these payments as well as various trailer payments.  This will be January business."

135.   Over time, certain commission trailers were never paid, without explanation, while others were arbitrarily cut in half, without explanation.  While Mr. Vanden Heuvel does not have access to, and Credit Suisse has refused to provide, documents necessary to calculate to the dollar, these unpaid trailers on the various Strategic Partners funds total at least $55,000.

136.   Credit Suisse also failed to pay a $37,500 placement fee on a more than $5 million private placement of one of his clients in SPVII.   Mr. Vanden Heuvel repeatedly demanded an explanation for Credit Suisse's failure to pay this trailer.  Credit Suisse first denied that Blackstone would pay a fee on private placements of over $5 million, which flatly contradicted SPVII's offering documents, then ignored Mr. Vanden Heuvel's demands for payment.  It was only in May 2019, after testifying in this arbitration, that Mr. Vanden Heuvel received $18,750, arbitrarily withholding 50% of the commission trailer.  Mr. Vanden Heuvel is owed the remaining $18,750.

137.   Credit Suisse also failed to pay commission trailers on the following private

equity limited partnerships: China Harvest Partners, L.P.; China Spring Partners, LP; and Credit Suisse China Harvest II Feeder, L.P.  After joining UBS, Mr. Vanden Heuvel reached out to Mr. Sierens regarding these unpaid commission trailers.  In turn, Mr. Sierens reached out internally. Neither Mr. Sierens nor Mr. Vanden Heuvel ever received an explanation.

138.    Credit Suisse has failed to pay these commissions.  While Credit Suisse has refused to provide documentation sufficient to calculate the precise amount owed, it is at least $30,000.

139.    In total, Credit Suisse has failed and refused to pay Mr. Vanden Heuvel commission trailers in an amount to be proven at the hearing but in no event less than $103,750.

140.    Credit Suisse's failure to pay owed commissions breached the employment agreement between Credit Suisse and Mr. Vanden Heuvel and violated the New York Labor Law or, in the alternative, Illinois Wage Act.

### Claimant David Hirsch

*Deferred Compensation*

141.    Mr. Hirsch understood the October 20, 2015 announcement to mean that Credit Suisse was closing at least the U.S. Private Bank and perhaps other divisions.

142.    Phil Vasan's statement on October 21, 2015 that Credit Suisse would honor its deferred compensation obligations to RMs who joined Wells Fargo and that "[a]nything else is a voluntary resignation to a third-party" was the only statement Credit Suisse made to Mr. Hirsch regarding the vesting of his deferred compensation prior to mid-February 2016.  This was a material misrepresentation.  Credit Suisse did not disclose to Mr. Hirsch until mid-February 2016 that: (a) he would be terminated as part of a reduction in force; (b) his date of termination would be May 31, 2016; (c) the last day he would be allowed to service his clients would be March 31,

2016; or (d) Credit Suisse would vest and pay his deferred compensation under the Award Certificates.

143.    More than three weeks after the October 20 and 21, 2015 conference call, Credit Suisse sent its RMs a template press release to be sent to clients.  Mr. Hirsch expressed his frustration with the delay and the lack of information when he responded to Mr. Jaffe: "This communication (and especially the press release) would have been nice to send to clients weeks ago.  In the interim, each of us were required to communicate as best we could."  Mr. Jaffe agreed "100%" and blamed the legal department for the delay.

144.    Mr. Hirsch was unable to attend Wells Fargo's pitch in St. Louis, but Mr. Kelly represented both of them.  Based upon Mr. Kelly's meeting with Wells Fargo management and his own due diligence, Mr. Hirsch determined that Wells Fargo could not support the alternative investments that comprised more than half his business, YES or structured products in general, all of which were essential to Mr. Hirsch's clients.

145.    After the October announcement, day-to-day business at Credit Suisse became more difficult given the deterioration of trading staff, equity analysts and researchers and compliance personnel.  Mr. Hirsch's clients were becoming increasingly concerned with Credit Suisse's ability to handle their business.  In one instance, Mr. Hirsch was only able to provide clients with an investment vehicle's own commentary rather than an objective research report because of the deficiencies in Credit Suisse's staff.  The clients took notice:

> Getting Harvest's opinion is like asking the fox if the hens are all ok in there. Also, I spoke with Harvest prior to making the investment and their views about performance and oil prices was wrong so depending on them for another updated forecast does not make me feel warm and comfortable.  On another subject, when will you decide on where you will be landing? You have had plenty of time to figure out the best place for your clients. What's holding you up? I am relying on you to make good sound

investment recommendations. I begin to grow concerned if you
can't make this decision about a next firm.

The client's partner echoed the latter concerns:

Finally, I agree with Marc about your situation at Credit Suisse. I
think the uncertainty is starting to negatively [impact the] team's
effectiveness. You don't have access to new products and Credit
Suisse is not going to do you in any favors. I have a feeling you
guys are trying to negotiate the best deal you can with a new firm
and that is not helping us. To be honest with you, the lack of
communication and recommendations regarding Harvest is
shocking and indicative of the unhealthy situation. I am
establishing a deadline of January 31st to resolve the situation or I
will be forced to move elsewhere.

146.    By February 2016, Mr. Hirsch was unable even to find assistants to support his
team.

147.    On February 18, 2016, Credit Suisse sent Mr. Hirsch his Notice of Termination.
The Notice of Termination notified Mr. Hirsch that his last date of active employment was
March 31, 2016 and his employment termination date was May 31, 2016, which Mr. Hirsch
understood to be a garden leave.

148.    Credit Suisse also offered Mr. Hirsch a Termination Agreement Containing A
General Release and Waiver, which set forth the $61,615 severance payment Mr. Hirsch was due
as result of his involuntary termination. The Release and Waiver relieved Credit Suisse of all
liability to Mr. Hirsch and required him to serve a two month non-solicitation period following
his May 31 termination date.

149.    Credit Suisse never disclosed the purported "acceleration" policy to Mr. Hirsch.

150.    At the same time, Credit Suisse sent the February Letter to Mr. Hirsch's clients
informing them that:

Credit Suisse has decided to exit the Private Banking business in
the U.S. by March 31, 2016.  After this date, Credit Suisse will no

40

longer offer private banking or wealth management services and will wind-down all current product offerings and client relationships.  *This means that after March 31, 2016 Credit Suisse will no longer provide brokerage or investment advisory services or provide any investment advice to your account(s).  Rather we will only take instructions from you with regards to liquidation of your account assets and transfer of your account(s).*

151.    On March 11, 2016, Mr. Hirsch left for UBS and submitted a protocol letter to Bob Sierens:

> In light of Credit Suisse's decision to exit the U.S. Domestic Private Banking and Wealth Management arena, directive from Credit Suisse that my clients transfer their accounts from Credit Suisse by March 31, 2016, and the resulting termination of my position, please be advised that I have decided to accept a position with UBS Financial Services effective immediately.

152.    On April 5, 2016, Credit Suisse filed a Form U-5 for Mr. Hirsch notifying FINRA that he had been terminated and that his termination was "Voluntary".

153.    By letter dated April 7, 2016, Credit Suisse notified Mr. Hirsch that his deferred compensation Awards were cancelled retroactively on March 11, 2016.

154.    As of March 11, 2016, Mr. Hirsch had been granted 12,416 shares of Credit Suisse AG and a $24,000 cash award, all of which vested immediately upon his termination without cause.

155.    Credit Suisse's October 21, 2015 statement that RMs could either resign and join Wells Fargo, forfeiting their deferred compensation in exchange for Onboarding Awards, or resign and join a competitor, forfeiting their deferred compensation, was an anticipatory breach of Credit Suisse's contractual obligations to Mr. Hirsch, resulting in damages of $334,151.68.[11]

156.    In the alternative, Credit Suisse breached its contractual obligation to Mr. Hirsch

---

[11] $24.98 (10/21/15 CS share price) * 12,416 (outstanding shares) = $310,151.68 + $24,000 (cash award).

when it cancelled his deferred compensation on March 11, 2016, resulting in damages of $221,786.88.[12]

157.    Mr. Hirsch was entitled to severance of approximately $61,615 under Credit Suisse's severance policy.

158.    Credit Suisse has failed and refused to pay Mr. Hirsch in breach of its contractual obligations and in violation of the New York Labor Law or, in the alternative, Illinois Wage Act.

*Commission Trailers*

159.    Mr. Hirsch earned commissions on his clients' investments in SPVII.

160.    Mr. Hirsch's net split of production, pursuant to the RM Comp guide, was 45%.

161.    Since Mr. Hirsch joined UBS, Credit Suisse has paid 50% of each of his SPVII commission trailers, resulting in an underpayment of an amount to be proven at the hearing but in no event less than $187,500.  Credit Suisse has provided no explanation, documentation or contractual basis for this arbitrary underpayment of Mr. Hirsch's commissions.

162.    Credit Suisse has failed and refused to pay Mr. Hirsch in breach of its contractual obligations and in violation of the New York Labor Law or, in the alternative, Illinois Wage Act.

**Claimant James Kelly**

*Deferred Compensation*

163.    Mr. Kelly understood the October 20, 2015 announcement to mean that Credit Suisse was "without question" closing its U.S. Private Bank.

164.    Phil Vasan's statement on October 21, 2015 that Credit Suisse would honor its deferred compensation obligations to RMs who joined Wells Fargo and that "[a]nything else is a voluntary resignation to a third-party" was the only statement Credit Suisse made to Mr. Kelly

---

[12] $15.93 (2/16/16 CS share price) * 12,416 (outstanding shares) = $197,786.88 + $24,000 (cash award).

regarding the vesting of his deferred compensation prior to mid-February 2016.  This was a material misrepresentation.  Credit Suisse did not disclose to Mr. Kelly until mid-February 2016 that: (a) he would be terminated as part of a reduction in force; (b) his date of termination would be May 31, 2016; (c) the last day he would be allowed to service his clients would be March 31, 2016; or (d) Credit Suisse would vest and pay his deferred compensation under the Award Certificates.

165.    After the October 20 and 21, 2015 conference calls, Mr. Kelly had difficulty communicating with his clients about the Wells Fargo deal because Credit Suisse did not provide enough details to be able to relay a concrete message and he was unsure what information he was allowed to share.  Several of Mr. Kelly's clients were concerned about the deal and a few even expressed concerns that their assets would be seized in a bankruptcy proceeding because they did not have enough information about the transaction.

166.    Mr. Kelly, along with many other RMs, attended Wells Fargo's pitch in St. Louis and spent time with senior Wells Fargo management to better understand its platform and offerings.  After the trip to St. Louis, Mr. Kelly learned that the private equity, structured note and YES business that formed well over half of his book of business would not be supported at Wells Fargo because of their platform limitations.  Ultimately, Mr. Kelly needed to move to a firm that would be able to facilitate the YES or another option-overlay strategy.  Wells Fargo was unable to do either.  Mr. Kelly was forced to wait and see where the individuals who made up the YES team were going to land before making a decision on behalf of his clients.

167.    After the October 20 announcement, the basic resources available at Credit Suisse, including products, analysts and researchers, began to deteriorate and new business virtually halted.  Though Mr. Kelly placed clients in SPVII, this was an exceptional case and he

otherwise did little or no new business.  Mr. Kelly's clients took notice, sending Mr. Kelly's

partner, David Hirsch, an e-mail in January 2016 questioning the team's ability to do their job

given the vacuum of information by Credit Suisse and warning them of the need to seek

information from *competitors*:

> How can you make recommendations on investments and portfolio
> construction when you are getting absolutely no input from CS.
> You and James are bright but you do not have the ability to
> individually understand what is going on in very turbulent markets.
> You guys individually are trying to compete with all of Goldman
> Sachs and that will never work.  Marc and I are having to go to
> Goldman to get advice on things like Harvest and that is wrong.
> Goldman has internal people who follow the MLP market,
> including developing a perspective on managers like Harvest.

168.    Mr. Kelly and Mr. Hirsch fielded a number of complaints from UHNW,

sophisticated clients, some of whom threatened to leave unless they quickly moved to a new

firm.

169.    On February 22, 2016, Credit Suisse sent Mr. Kelly his Notice of Termination.

The Notice of Termination notified Mr. Kelly that his last date of active employment was March

31, 2016 and his employment termination date was May 31, 2016, which Mr. Kelly understood

to be a garden leave.

170.    Credit Suisse also offered Mr. Kelly a Termination Agreement Containing A

General Release and Waiver, which set forth the $50,769 severance payment Mr. Kelly was due

as result of his involuntary termination. The Release and Waiver relieved Credit Suisse of all

liability to Mr. Kelly and required him to serve a two month non-solicitation period following his

May 31 termination date.

171.    Credit Suisse never disclosed the purported "acceleration" policy to Mr. Kelly.

172.    At the same time, Credit Suisse sent the February Letter to Mr. Kelly's clients

44

informing them that:

> Credit Suisse has decided to exit the Private Banking business in the U.S. by March 31, 2016. After this date, Credit Suisse will no longer offer private banking or wealth management services and will wind-down all current product offerings and client relationships. *This means that after March 31, 2016 Credit Suisse will no longer provide brokerage or investment advisory services or provide any investment advice to your account(s). Rather we will only take instructions from you with regards to liquidation of your account assets and transfer of your account(s).*

173. On March 11, 2016, Mr. Kelly left for UBS and submitted a protocol letter to Bob Sierens.

174. On April 5, 2016, Credit Suisse filed a Form U-5 for Mr. Kelly notifying FINRA that he had been terminated and that his termination was "Voluntary."

175. By letter dated April 7, 2016, Credit Suisse notified Mr. Kelly that his deferred compensation Awards were cancelled retroactively to March 11, 2016.

176. As of March 11, 2016, Mr. Kelly had been granted 8,502 shares of Credit Suisse AG, which had vested immediately upon his termination without cause.

177. Credit Suisse's October 21, 2015 statement that RMs could either resign and join Wells Fargo, forfeiting their deferred compensation in exchange for Onboarding Awards, or resign and join a competitor, forfeiting their deferred compensation, was an anticipatory breach of Credit Suisse's contractual obligations to Mr. Kelly, resulting in damages of $212,379.96.[13]

178. In the alternative, Credit Suisse breached its contractual obligation to Mr. Kelly when it cancelled his deferred compensation on March 11, 2016, resulting in damages of $135,436.86.[14]

179. Mr. Kelly was entitled to severance of approximately $50,769 under Credit

---

[13] $24.98 (10/21/15 CS share price) * 8,502 (outstanding shares) = $212,379.96.
[14] $15.93 (3/11/16 CS share price) * 8,502 (outstanding shares) = $135,436.86.

Suisse's severance policy.

180.    Credit Suisse has failed and refused to pay Mr. Kelly in breach of its contractual obligations and in violation of the New York Labor Law or, in the alternative, Illinois Wage Act.

### *Commission Trailers*

181.    Mr. Kelly earned commissions on his clients' investments in SPVII.

182.    Mr. Kelly's net split of production, pursuant to the RM Comp guide, was 45%.

183.    Since Mr. Kelly joined UBS, Credit Suisse has paid 50% of each of his SPVII commission trailers, resulting in an underpayment of an amount to be proven at the hearing but in no event less than $187,500.  Credit Suisse has provided no explanation, documentation or contractual basis for this arbitrary underpayment of Mr. Kelly's commissions.

184.    Credit Suisse has failed and refused to pay Mr. Kelly in breach of its contractual obligations and in violation of the New York Labor Law or, in the alternative, Illinois Wage Act.

### Claimant Michael Board

### *Deferred Compensation*

185.    By September 2015, Mr. Board was alarmed by the rumors and press surrounding Credit Suisse's plan to sell its U.S. Private Bank.  Although he had heard rumors of a potential sale to Morgan Stanley or J.P. Morgan, he was stunned by the October 20, 2015 announcement and felt that given his relatively new business at Credit Suisse, he would face significant pushback from his new UHNW clients when he informs them that they needed to move to a new bank, especially one like Wells Fargo, after only recently coming on board to Credit Suisse.

186.    In messages from his colleagues and clients, he heard the same reaction: "Complete joke […] Seriously WELLS??? WTF???"  Mr. Board was frustrated because Wells Fargo was never on his or his colleagues' radar in terms of having similar clients or running a

similar platform.  Wells Fargo was in the retail and commercial lending business, but did not have a serious presence in the UHNW space.  His fellow RM Daniel Madura echoed this sentiment: "I hope you know how to sell mortgages and CDs."

187.    Phil Vasan's statement on October 21, 2015 that Credit Suisse would honor its deferred compensation obligations to RMs who joined Wells Fargo and that "[a]nything else is a voluntary resignation to a third-party" was the only statement Credit Suisse made to Mr. Board regarding the vesting of his deferred compensation prior to mid-February 2016.  This was a material misrepresentation.  Credit Suisse did not disclose to Mr. Board until mid-February 2016 that: (a) he would be terminated as part of a reduction in force; (b) his date of termination would be May 31, 2016; (c) the last day he would be allowed to service his clients would be March 31, 2016; or (d) Credit Suisse would vest and pay his deferred compensation under the Award Certificates.

188.    Mr. Board had four core families that comprised his book of business, and all of them refused to move to Wells Fargo.  One client went so far as to tell him that "I've been extremely happy, but if you go to Wells, I am going to Goldman Sachs."  Another client told him that he had an account at Wells Fargo years ago and "I left and I actually should have sued them for $3 million."

189.    Mr. Board, along with many other RMs, attended a conference in St. Louis and spent time with senior Wells Fargo management to better understand its platform and offerings. After the trip to St. Louis, Mr. Board reached out to Lisa Stumpf, part of Wells Fargo management, about an offer and her response was: "Michael, your clients are not a fit here.  You are not a fit here, and we don't believe you would be good in our culture.  So we are not giving you an offer."  In or around the beginning of 2016, a friend and fellow RM in Mr. Board's

Northbrook branch, Richard Kirsch, a $6 million producer who transitioned to Wells Fargo, was able to secure an offer for Mr. Board, but Mr. Board could not take it without losing his clients. He also felt Wells Fargo had made clear that he and his clients were not welcome.

190.    In early January 2016, Credit Suisse closed Mr. Board's Northbrook branch. Although Mr. Board was informed that he could conduct his business out of the Chicago branch, some 20 miles away, he was never given a pass for the building and needed to be escorted in by a banker each time he came to work, sometimes standing in the lobby for 15-20 minutes waiting for someone to become available.

191.    The closure cost Mr. Board a major client he shared with another RM, who called the client after joining Wells Fargo and told him the office was closing, Mr. Board did not know where he was going and the client needed to transfer his account to Wells Fargo.  "The office is closing, Michael doesn't know where he is going, and you need to move your money."  That client subsequently left Wells Fargo.

192.    On February 19, 2016, Credit Suisse sent Mr. Board his Notice of Termination. The Notice of Termination notified Mr. Board that his last date of active employment was March 31, 2016 and his employment termination date was May 31, 2016, which Mr. Board understood to be a garden leave.

193.    Credit Suisse also offered Mr. Board a Termination Agreement Containing A General Release and Waiver, which set forth the $16,442.31 severance payment Mr. Board was due as a result of his involuntary termination.  The Release and Waiver relieved Credit Suisse of all liability to Mr. Board and required him to serve a two month non-solicitation period following his May 31 termination date.

194.    Given the impending closure of the U.S. Private Bank, his lack of private banking

employment offers at the time, his clients' unwillingness to move to Wells Fargo, the impossible garden leave provision, his need to support his family and the deferred compensation that was still owed to him, in mid-February 2016 Mr. Board spoke to Katherine Connolly in Human Resources about the possibility of staying at Credit Suisse until March 31, 2016, beginning employment somewhere else on April 1, 2016, and still collecting his deferred compensation. Her response was simply "the documents are the documents."

195.    At no time did Credit Suisse inform Mr. Board of a purported "acceleration policy."

196.    At the same time, Credit Suisse sent the February Letter to Mr. Board's clients informing them that:

> Credit Suisse has decided to exit the Private Banking business in the U.S. by March 31, 2016.  After this date, Credit Suisse will no longer offer private banking or wealth management services and will wind-down all current product offerings and client relationships.  *This means that after March 31, 2016 Credit Suisse will no longer provide brokerage or investment advisory services or provide any investment advice to your account(s).  Rather we will only take instructions from you with regards to liquidation of your account assets and transfer of your account(s).*

197.    On March 18, 2016, Mr. Board left for Morgan Stanley Private Wealth and submitted a protocol letter to Mr. Sierens:

> Please be advised, I plan to move from Credit Suisse to Morgan Stanley, effective immediately.  This termination of employment is the result of a constructive discharge based upon the imminent closing of Credit Suisse's private banking unit in the United States.

198.    On April 11, 2016, Credit Suisse filed a Form U-5 for Mr. Board notifying FINRA that he had been terminated and that his reason for termination was "Voluntary".

199.    By letter dated April 7, 2016, Credit Suisse notified Mr. Board that his deferred compensation Awards were cancelled retroactively to March 18, 2016.

200.    As of March 18, 2016, Mr. Board had been granted 2,522 shares of Credit Suisse AG and a $50,100 cash award, all of which vested immediately upon his termination without cause.

201.    Credit Suisse's October 21, 2015 statement that RMs could either resign and join Wells Fargo, forfeiting their deferred compensation in exchange for Onboarding Awards, or resign and join a competitor, forfeiting their deferred compensation, was an anticipatory breach of Credit Suisse's contractual obligations to Mr. Board, resulting in damages of $113,099.56.[15]

202.    In the alternative, Credit Suisse breached its contractual obligation to Mr. Board when it cancelled his deferred compensation on March 18, 2016, resulting in damages of $88,232.64.[16]

203.    Mr. Board was entitled to severance of $16,442.31.

204.    Credit Suisse has failed and refused to pay Mr. Board in breach of its contractual obligations and in violation of the New York Labor Law or, in the alternative, Illinois Wage Act.

*Unpaid Commission Split*

205.    In or around February 2013, Mr. Board began speaking with Junior Bridgeman, a personal acquaintance who was a former professional athlete and CEO of Bridgeman Industries LLC, which owns more than 150 Wendy's franchises throughout the country.  Pursuant to Credit Suisse's PB USA Global Prospecting List Guidelines, Mr. Board entered Mr. Bridgeman into Credit Suisse's Global Prospecting List ("GPL") as his prospect on or before February 28, 2013. Before granting the prospect request, there was a firmwide relationship search conducted by the GPL desk.  Not only did Mr. Bridgeman have no existing relationships, no one had ever tried to

---

[15] $24.98 (10/21/15 CS share price) * 2,522 (outstanding shares) = $62,999.56 + $50,100 (cash award).
[16] $15.12 (3/18/16 CS share price) * 2,522 (outstanding shares) = $38,132.64 + $50,100 (cash award).

reserve him.

206.    The PB USA Global Prospecting List Guidelines provide:

> While a prospect is listed on the GPL, all RMs, other than the RM
> assigned, are prohibited from calling on, marketing, or sending
> materials to the individual or company and its executives …
> Adherence to the policy by all RM's and enforcement by
> management enhances the integrity, professionalism, and success
> of our approach.

***

> Prospects that are approved will be listed for an initial period of
> one year. Upon expiration of that initial period, an RM will receive
> an email notification that will require the RM to request an
> extension of time within 5 business days or indicate that the
> prospect may be reassigned or deleted from the system. Managers
> will grant extensions of time only in cases where an RM can
> demonstrate tangible progress. Such extensions shall be for no
> more than a year at a time.

***

> If another RM wishes to prospect that individual and feels they
> have a compelling case for bringing in that prospect as a client in
> the immediate future, they should challenge the prospect.

***

> Intentional violations of the above guidelines will result in
> penalties, including sanctions that impose a forced economic split.

***

> A team will be penalized if they solicit a prospect that is on
> another team's GPL, regardless of the circumstances.  If the
> prospect opens an account with the new team, the new team must
> compensate the RM who initially had the prospect with 50% of
> revenues for 2 years for all accounts related to the same beneficial
> owner.

207.    Upon Mr. Bridgeman's request, Mr. Board arranged a meeting at the Kentucky

Derby in May 2013.   After multiple prospecting discussions with Mr. Bridgeman and the

51

approval of Mr. Board's GPL request, assigning Mr. Bridgeman to him, another RM in the Philadelphia branch, Joseph Godwin, Jr., met with Mr. Bridgeman at the Kentucky Derby, where Credit Suisse sponsored a table. On April 5, 2013, Mr. Godwin informed Rich Jaffe that, despite being aware of Mr. Bridgeman's designation as Mr. Board's prospect on the GPL, he was going to "proceed as planned" without formally challenging the prospect pursuant to the GPL guidelines.

208.    Mr. Bridgeman remained Mr. Board's prospect on the GPL and this assignment was never formally challenged because there was no basis under the GPL guidelines for a challenge. Ultimately, Mr. Bridgeman became a client of Credit Suisse in October 2014 and was assigned to Mr. Godwin. Yet even after he opened his account, he was listed on the GPL as Mr. Board's prospect.

209.    None of Mr. Bridgeman's assets and production were credited to Mr. Board, though Credit Suisse required a 50% split. Had Mr. Bridgeman's assets and production been properly attributed, Mr. Board would have had an additional $45 million of assets in his book, which when added to the approximately $42 million of assets that he had in October 2015, would have made him eligible to receive the Deferred PB AUM Cash Award of $50,100 that he was granted on February 4, 2013, which set an asset target of $70 million, addressed above.

210.    Mr. Board never received his 50% split of the RM credits generated from Mr. Bridgeman's accounts, totaling $18,560.30 in commissions.

211.    Credit Suisse's failure to pay these commissions to Mr. Board breached its contracts with Mr. Board and violated the New York Labor Law or, in the alternative, Illinois Wage Act.

**Family Wealth Management**

*FWM Commissions*

212.    Ms. DiChristofano, Mr. Whitney and Mr. Sakach joined Credit Suisse when it acquired Frye-Louis Capital Management in 2001.    Initially, Frye-Louis was to operate independently within Credit Suisse, reporting directly into Credit Suisse AG's Zurich headquarters, and to expand into satellite offices on the east and west coasts.

213.    Pursuant to the terms of the deal between Credit Suisse and Frye-Louis, Frye-Louis' partners, including Ms. DiChristofano, Mr. Whitney and Mr. Sakach, were subject to a non-solicitation provision for approximately four years, after which time they would own their book of business.  The provision expired in and around 2005.

214.    The Frye-Louis team was initially compensated based upon the revenues of the business.  Ms. DiChristofano, Mr. Whitney and Mr. Sakach were paid base salaries and bonuses from a pool of revenues that was set aside and allocated by Peter Frye.

215.    In 2006, Anthony DeChellis became head of the US Private Bank.  Mr. DeChellis changed Frye-Louis' name to Credit Suisse Family Wealth Management.  In 2007, he instructed Ms. DiChristofano, Mr. Whitney and Mr. Sakach to obtain their Series 7 and Series 66 and become RMs at Credit Suisse.

216.    FWM was compensated through advisory fees paid by clients on their assets under management.  This was not uncommon at Credit Suisse.  The RM Compensation Guide provides for a split of client advisory fees, as it does client transactional commissions and institutional commissions, and many RMs received commissions on these fees that that were two, three or four times the FWM Team's base and bonus compensation.

217.    In or around 2008, FWM's compensation model also changed.    From 2008

through 2011, Ms. DiChristofano, Mr. Whitney and Mr. Sakach (the "FWM Team" henceforth) received a base salary and a discretionary bonus from the revenue pool for Private Banking – Americas, which was controlled by Mr. DeChellis, rather than the pool of revenues generated by FWM.  The FWM Team did not receive commissions or deferred compensation between 2008 and 2011.

218.    In theory, the FWM Team's bonus was based upon performance metrics and shadow credits generated on business they helped to close for other RMs.  Mr. Sakach, in particular, spent several years flying to pitch meetings and describing FWM's business model and services.  In practice, the FWM Team's bonuses from 2008 to 2011 were stagnant, reflecting neither the revenue they produced for Credit Suisse directly nor the shadow credits.

219.    By 2011, the FWM Team had assets under management of approximately $1.5 billion and was generating, on average, production of more than $10 million per year.  An RM team with the same production would have been paid $4-4.5 million per year, but the FWM Team was paid less than $1 million in 2011.

220.    The FWM Team, and particularly Mr. Sakach, had been increasingly dissatisfied by the disparity between their compensation and that of other producers at Credit Suisse, particularly given Mr. Sakach's workload and the failure of the "shadow credits" to materialize. Mr. Whitney agreed to renegotiate.

221.    Upon obtaining legal counsel and exploring the FWM Team's options, Mr. Whitney learned that he had the freedom to take the FWM book of business with him to another firm.  He met with the David McGranahan, the Chicago Branch Manager, Bill Woodson, his manager, Peter Skoglund, the Vice Chairman of Credit Suisse Americas, and Stuart Brenner, the COO of the US Private Bank, to renegotiate the FWM compensation structure.

222.    The FWM Team demanded a fixed split of their production.  Because FWM was a large team, Credit Suisse insisted on a lower split than other RM teams.  For the same reason, Mr. Whitney asked that FWM's commissions be accrued monthly but paid out at the end of the year at his discretion, which allowed him to set incentives for his team.  As the commissions were deferred to the end of the year, the FWM Team required larger draws than other RMs, who took their commissions monthly, but these draws replaced their salaries.

223.    Otherwise, as multiple Credit Suisse executives wrote in e-mails between 2011 and early 2012, the objective of both Credit Suisse and Mr. Whitney was to ensure the FWM Team were treated as much like other RMs as possible.  On December 1, 2011, for example, Mr. Woodson wrote that "the proposed change to comp for Whitney/Sakach and Team is as follows: 1.  Convert Whitney, Sakach and their team members to the same comp plan as an RM team where they get paid on grid.  They would in essence become RMs for this purpose and stop being paid a salary and bonus."  For this reason, the FWM Team was subject to the RM deferral tables as set forth by the RM Compensation Guide.  On December 14, 2011, for example, Mr. Brenner, Credit Suisse's COO, wrote that "i need to talk with tony [DeChellis, the head of the US Private Bank] again and i also want to make sure that these folks get treated like rm's as it related to deferred comp…"

224.    On February 28, 2012, the FWM Team and Credit Suisse entered a new compensation agreement "effective January 1, 2012."  Its terms were memorialized in numerous e-mails and evidenced by the course of dealing between the parties: (1) 30% split of gross revenues, accrued monthly and distributed at the discretion of Mr. Whitney; (2) monthly draws against commissions; (3) Credit Suisse paying for support staff to the same degree as for other RMs at similar production levels; and (4) deferrals at the RM deferral rates.  This constituted a

contract between Credit Suisse and the FWM Team that governed the terms of the FWM Team's compensation, as a component and condition of their employment agreements. It was agreed to by Tony DeChellis, the head of the US Private Bank, who had actual and apparent authority to bind Credit Suisse.

225.    No integrated writing was ever created.   A draft "Procedure Manual" was distributed in 2012 but contains several errors, among them a reference to the firm-wide deferral tables.   Mr. Whitney brought this error to the attention of Credit Suisse and Credit Suisse corrected it, as evidenced by the course of dealing between the parties.   The same Credit Suisse employee who drafted the "Procedure Manual," Michael Kelly, wrote in an e-mail dated January 14, 2013: "As a reminder these payments will be subject to the RM deferral schedule in the Comp Guide rather than that applied to non-RM bonuses."

226.    Mr. Whitney and Mr. McGranahan, his branch manager, sought a formal, executed written agreement, but were told it was unnecessary.    As Mr. McGranahan memorialized in an e-mail dated February 4, 2014: "Jim Whitney and I had requested a formal agreement; however, Heather Vanderhoof felt this would constitute a new payment plan that would require comp committee involvement.   Dylan Pollack and HR were involved in these conversations.   Given they are paid through the RM production system, she felt it was simply a manual override/agreement on payout and allocation."

227.    In 2012, FWM was compensated pursuant to the compensation agreement between the parties.   The FWM Team accrued commissions every month, which were processed through the RM compensation system, tracked through RM compensation summaries, reviewed by the RM Compensation Team monthly, and at the end of the year.   The final numbers were approved by Mr. Whitney, who distributed the commissions to his team members based upon

performance.  He submitted these "bonuses" to Credit Suisse management, who approved them every year with no changes.  In every year, Credit Suisse paid the FWM Team their 30% commission pool to the penny.

228.    In 2012, in accordance with the agreement, Mr. Whitney received a draw of $275,000.00, deducted from his commissions, and a "bonus," consisting entirely of the FWM Team's accrued commissions, of $810,536.80, for total 2012 compensation of $1,085,536.80. Mr. Sakach received draw of $265,000.00 and a "bonus," consisting entirely of the FWM Team's accrued commissions, of $220,000.00, for total 2012 compensation of $485,000.00. Mrs. DiChristofano received a draw of $268,750.00 and a "bonus," consisting entirely of the FWM Team's accrued commissions, of $160,000.00, for total 2012 compensation of $428,750.00.  Credit Suisse, according to its own internal documents, applied the RM deferral tables.  100% of the FWM Team's compensation was their own earned commissions.

229.    The FWM Team's 2013 compensation was paid in accordance with the agreement.

230.    In late January 2015, the FWM Team received their 2014 "Compensation Summaries" from Credit Suisse.  This was the first time the FWM Team learned that Credit Suisse had breached the contract between the FWM Team and Credit Suisse.

231.    For 2014, the FWM Team was retroactively subjected to the firm-wide deferral tables in breach of the contract between the FWM Team and Credit Suisse and the employment agreements between FWM and Credit Suisse.  Where the deferral rate under the RM Compensation Guide for a Managing Director was 20%, the firm-wide tables permitted deferrals as high as 90%.  Mr. Whitney's $1,562,016 in earned commissions was subject to an effective

deferral[17] of 89.6%. $997,438.00 of his 2014 compensation was unlawfully deferred. His cash compensation for 2014 was $564,578.00, representing a decline of approximately 60% from 2013, the last year Credit Suisse complied with the agreement. Had Credit Suisse applied the RM deferral table, as required by the agreement, Mr. Whitney's 2014 deferral would have been $222,403.20.[18]

232.    Mr. Sakach's cash compensation for 2014 was $426,150, representing a decline of approximately 18% from 2013, the last year Credit Suisse complied with the agreement. $131,850 of his 2014 compensation was unlawfully deferred. Had Credit Suisse applied the RM deferral table, as required by the agreement, Mr. Sakach's 2014 deferral would have been $46,200.00.[19]

233.    Mrs. DiChristofano' s cash compensation for 2014 was $360,625.00, representing a decline of approximately 20% from 2013, the last year Credit Suisse complied with the agreement. $55,125 of her 2014 compensation was unlawfully deferred. Had Credit Suisse applied the RM deferral table, as required by the agreement, Mrs. DiChristofano' s 2014 deferral would have been $24,862.50.[20]

234.    Credit Suisse had made the decision to change the FWM Team's compensation agreement no later than April 2014. It did not notify the FWM Team, however, giving them no

---

[17] Only Mr. Whitney's draw, $275,000, was exempt from deferral. Pursuant to the RM Compensation Guide, a Managing Director's first $450,000 is exempt from deferral, referred to as the "Cash-Only Threshold." Subtracting this amount from Mr. Whitney's total 2014 compensation, $1,562,016, $1,112,016 of Mr. Whitney's 2014 compensation should have been subject to deferral. $997,438 is 89.6% of $1,112,016.

[18] $1,562,016 (total commissions) - $450,000 (cash threshold pursuant to RM Compensation Guide) = $1,112,016 * 20% (Managing Director deferral rate pursuant to RM Compensation Guide).

[19] $558,000 (total commissions) - $250,000 (cash threshold pursuant to RM Compensation Guide) = $308,000 * 15% (Director deferral rate pursuant to RM Compensation Guide).

[20] $415,750 (total commissions) - $250,000 (cash threshold pursuant to RM Compensation Guide) = $165,750 * 15% (Director deferral rate pursuant to RM Compensation Guide).

opportunity to negotiate or seek other employment.  Instead, they continued to work and generate millions of dollars of revenue for Credit Suisse, month after month, under the terms of a compensation agreement Credit Suisse had secretly repudiated.  Credit Suisse then applied the deferral rates retroactively, in breach of the agreement and violation of the NYLL and Illinois Wage Act.

235.    Mr. Whitney immediately objected to Credit Suisse's breach.  He discussed it with colleagues, Mr. McGranahan, Mr. Skoglund and other Credit Suisse executives, who assured him that it would be corrected.  After Bob Sierens replaced Mr. McGranahan, he informed Mr. Whitney that the FWM deferred compensation problem was the first major task on his plate.  He agreed the problem would be fixed.  The FWM Team remained at Credit Suisse on the assurance that the breach would be remedied.

236.    Mr. Sierens worked on the problem throughout 2015.  By mid-summer, however, Credit Suisse was actively seeking to divest the US Private Bank and it was no longer possible to reverse the 2014 deferrals.  The FWM Team, like all of their colleagues, began looking for a new firm for their clients.  While they did not at any time agree or otherwise acquiesce to Credit Suisse's breach of the agreement, they had no remedy other than this arbitration.

237.    As Credit Suisse was closing the US Private Bank, Mr. Whitney and Mr. Sakach demanded that Credit Suisse pay FWM, both the FWM Team and their support staff, in cash before the end of the year, because otherwise the FWM Team and their support staff would potentially lost the vast majority of their compensation should they leave Credit Suisse in 2015.  They were particularly concerned about the December 7 deadline.  In an e-mail to Mr. Sierens on October 21, 2015, Mr. Whitney wrote: "Bob, I am assuming that the FWM Bonus pool will be paid prior to the Wells Fargo transition date of December 7, 2015 as it represents a legal

obligation of Credit Suisse.  Please confirm promptly."  Mr. Sierens responded by telling Mr. Whitney that it was still unclear as to how the payout would occur, but he did confirm that employees at Credit Suisse who were compensated on a 'base salary plus bonus' model were all receiving cash compensation without deferrals for 2015.  Mr. Whitney  also raised this issue with Meagan Diop in Human Resources, who told him in a November 6, 2015 email that she "did bring up the topic in NY and I have yet to receive a satisfactory response."

238.    Ultimately, Ms. Diop informed Mr. Whitney that none of the FWM Team's 2015 commissions would be deferred.  Like all other employees, such as Mr. Sierens, deferred at the firm-wide rates Credit Suisse applied to the FWM Team in 2014, the FWM Team would be compensated in cash.  This was consistent with both its prior-year treatment of the FWM Team and the basic fact that deferred compensation no longer served any meaningful retention or regulatory purpose.

239.    Credit Suisse ultimately determined that the FWM Team were RMs after all, breaching its agreement with Mr. Whitney, again without notice, to pay all in cash and deferring the FWM Team's 2015 compensation.  Christian Delorier was Credit Suisse's global head of compensation made the initial decision to breach the agreement and subject the FWM Team's 2014 compensation to the firm-wide deferral tables without communicating with or receiving authorization from senior Credit Suisse management or the executives, including the head of the Private Bank, who made the agreement.[21]  made this explicit in an e-mail dated December 9, 2015: "Part of me thinks all cash shld be 90 percent and if its in the bonus pool…other part makes me think they are really rm's…"

240.    Instead of applying the RM deferral rates, however, Credit Suisse again applied

---

[21] All of whom outranked Mr. Delorier.

the firm-wide deferral rates. They were the only team at Credit Suisse to receive this treatment: No other RMs were deferred at the firm-wide rate; no employees deferred at the firm-wide rate were deferred at all. Indeed, Credit Suisse eventually ceased deferring RMs as well, for the obvious reason that the business was closing.

241.    Mr. Whitney's $1,403,428 in earned commissions was subject to an effective deferral[22] of 65.1%. $620,636.00 of his 2015 compensation was unlawfully deferred. His cash compensation for 2015 was $782,792.00, representing a decline of approximately 57% from 2013, the last year Credit Suisse complied with the agreement. None of Mr. Whitney's 2015 compensation should have been deferred. In the alternative, had Credit Suisse applied the RM deferral table, as required by the agreement, Mr. Whitney's 2015 deferral would have been $190,685.60.[23]

242.    Mr. Sakach's cash compensation for 2015 was $480,933. $215,933 of his 2015 compensation was unlawfully deferred. None of Mr. Sakach's 2015 compensation should have been deferred. In the alternative, had Credit Suisse applied the RM deferral table, as required by the agreement, Mr. Sakach's 2015 deferral would have been $67,029.90.[24]

243.    Ms. DiChristofano' s cash compensation for 2015 was $353,125. $50,625 of her 2015 compensation was unlawfully deferred. None of Ms. DiChristofano' s 2015 compensation should have been deferred. In the alternative, had Credit Suisse applied the RM deferral table, as

---

[22] Only Mr. Whitney's draw, $275,000, was exempt from deferral. Pursuant to the RM Compensation Guide, a Managing Director's first $450,000 is exempt from deferral, the "Cash-Only Threshold." Subtracting this amount from Mr. Whitney's total 2015 compensation, $1,403,428, $953,428 of Mr. Whitney's 2015 compensation should have been subject to deferral. $620,636 is 65.1% of $953,428.

[23] $1,403,428 (total commissions) - $450,000 (cash threshold pursuant to RM Compensation Guide) = $953,428 * 20% (Managing Director deferral rate pursuant to RM Compensation Guide).

[24] $696,866 (total commissions) - $250,000 (cash threshold pursuant to RM Compensation Guide) = $446,866 * 15% (Director deferral rate pursuant to RM Compensation Guide).

required by the agreement, Ms. DiChristofano' s 2015 deferral would have been $23,062.50.[25]

244.    Again, the FWM Team immediately objected.  In a January 29, 2016 e-mail, Mr. Whitney wrote to Ms. Connolly:

> I'm disappointed that you did not return my call yesterday after we originally spoke about my 2015 variable compensation as you said you would in order to explain the business justification for deferring my earned and accrued relationship manager wages. I'll assume your unwillingness to discuss the decision to defer over 50% of my variable compensation as evidence that they is no logical explanation available […] For the record, I specifically discussed this topic with Meagan Diop when she was last in Chicago and on a November conference call.  She acknowledged the logic and supported the rationale for an all cash variable compensation payment (accrued wages) for multiple reasons as did Bob Sierens especially given the undeniable elimination of the Credit Suisse Private Banking business in the United States.

245.    In a January 31, 2016 e-mail, Mr. Sakach wrote to Ms. Connolly:  "I received my bonus award numbers on Thursday and was more than surprised to see a deferral of my RM compensation.  As you know, the FWM pool is a compensation pool that is held back and paid at year end and not a variable incentive pool."

246.    In a February 5, 2015 e-mail, Mr. Whitney wrote to Ms. Connolly:

> The Credit Suisse Private Banking senior management team understands that Credit Suisse Family Wealth Management (FWM) bonus pool represents nothing more than a placeholder of our earned wages for payment to the team. It is a "grid" calculated number of 30% that was scheduled to move to full grid payout absent the announcement made by Credit Suisse to exit the US Wealth Management Advisory business. In no way, was it ever intended to allow Credit Suisse to arbitrarily exercise authority over our wages. In fact, this is exactly what the agreement was designed to avoid. Please speak with the following individuals to confirm the intent of the 2015 accrued wages pool as well as the intent of the FWM when it was originally designed. All will confirm my stated view as accurate and correct.

---

[25] $403,750 (total commissions) - $250,000 (cash threshold pursuant to RM Compensation Guide) = $153,750 * 15% (Director deferral rate pursuant to RM Compensation Guide).

Peter Skoglund, PB North America Vice Chairman

Rich Jaffe, Managing Director Head of Private Banking America

Rob Sierens, Managing Director, Head of Chicago/Northbrook

Dave McGranahan, Former Managing Director Head of Chicago/Northbrook Office

(meeting held on 1/28/16 to confirm contents of this email)

The strategic right to recruit relationship established with Wells Fargo serves as undeniable evidence that the relationship managers ability at Credit Suisse to provide ongoing wealth management services to clients is ending.  In fact, most of my relationship manager colleagues have already moved on to new financial institutions. I receive calls weekly from colleagues wondering what the impact of winding down different parts of PB America will be on the FWM business. Just yesterday as an example, I received a call notifying me of the intent to send a letter to clients informing them of that the ICS will no longer be supported after March 31, 2016.

As you are well aware, it is impossible to construct a plausible scenario whereby I can be employed by Credit Suisse long enough ever receive the accrued wages you and/or others independently and without my prior knowledge elected to defer on my behalf. With this in mind, please properly justify your actions explaining the rational for the violation of the agreement Credit Suisse has with Family Wealth Management knowing that this action was contrary to the understanding of entire PB North America management team.

247.    Mr. Sierens was also surprised, writing to Rich Jaffe on January 28, 2016: "My last big test I failed at.  family wealth was paid in stock.  I am thoroughly perplexed."

248.    Credit Suisse's 2014 deferrals were unlawful and in breach of the contract between the FWM Team and Credit Suisse.  Credit Suisse is liable to Mr. Whitney for 100% of the amount deferred in breach of the agreement, totaling $997,438.00.  In the alternative, Credit Suisse is liable to Mr. Whitney for the amount deferred in excess of what should have been

deferred pursuant to the agreement and RM Compensation Guide, totaling $775,034.80.[26]

249.    Credit Suisse's 2014 deferrals were unlawful and in breach of the contract between the FWM Team and Credit Suisse.  Credit Suisse is liable to Mr. Sakach for 100% of the amount deferred in breach of the agreement, totaling $131,850.00.  In the alternative, Credit Suisse is liable to Mr. Sakach for the amount deferred in excess of what should have been deferred pursuant to the agreement and RM Compensation Guide, totaling $85,650.[27]

250.    Credit Suisse's 2014 deferrals were unlawful and in breach of the contract between the FWM Team and Credit Suisse.  Credit Suisse is liable to Ms. DiChristofano for 100% of the amount deferred in breach of the agreement, totaling $55,125.00.  In the alternative, Credit Suisse is liable to Ms. DiChristofano for the amount deferred in excess of what should have been deferred pursuant to the agreement and RM Compensation Guide, totaling $30,262.50.[28]

251.    Credit Suisse's 2015 deferrals were unlawful and in breach of the contract between the FWM Team and Credit Suisse.  Credit Suisse is liable to Mr. Whitney for 100% of the amount deferred in breach of the agreement, totaling $620,636.00.  In the alternative, Credit Suisse is liable to Mr. Whitney for the amount deferred in excess of what should have been deferred pursuant to the agreement and RM Compensation Guide, totaling $429,950.40.[29]

252.    Credit Suisse's 2015 deferrals were unlawful and in breach of the contract between the FWM Team and Credit Suisse.  Credit Suisse is liable to Mr. Sakach for 100% of the amount deferred in breach of the agreement, totaling $215,933.  In the alternative, Credit Suisse is liable to Mr. Sakach for the amount deferred in excess of what should have been

---

[26] $997,438 (2014 deferral) - $222,403.20 (2014 deferral under RM Compensation Guide).
[27] $131,850 (2014 deferral) - $46,200 (2014 deferral under RM Compensation Guide).
[28] $55,125 (2014 deferral) - $24,862.50 (2014 deferral under RM Compensation Guide).
[29] $620,636 (2015 deferral) - $190,685.60 (2015 deferral under RM Compensation Guide).

deferred pursuant to the agreement and RM Compensation Guide, totaling $148,903.10.[30]

253.    Credit Suisse's 2015 deferrals were unlawful and in breach of the contract between the FWM Team and Credit Suisse.  Credit Suisse is liable to Ms. DiChristofano for 100% of the amount deferred in breach of the agreement, totaling $50,625.  In the alternative, Credit Suisse is liable to Ms. DiChristofano for the amount deferred in excess of what should have been deferred pursuant to the agreement and RM Compensation Guide, totaling $27,562.50.[31]

254.    Credit Suisse's failure and refusal to pay the FMW Team's 2014 and 2015 commissions, through its unlawful deferrals, breached its contract with the FWM Team and violated the New York Labor Law or, in the alternative, Illinois Wage Act.

***Deferred Compensation***

255.    By September 2015, Mr. Whitney was alarmed by the rumors and press surrounding Credit Suisse's plan to sell its U.S. Private Bank.  He was particularly concerned about Credit Suisse's decision to stop recruiting and pull recruiting offers.  His clients were also aware of the rumors, with members of the Louis Family, his largest client, expressing concern about the effect issues at Credit Suisse would have on their business and FMW's contingency plan should Credit Suisse exit the wealth management business.

256.    Mr. Whitney understood the October 20, 2015 announcement to be Credit Suisse's exit from the US wealth management business. Mr. Whitney's clients expressed dissatisfaction with Wells Fargo as the counter-party to the transaction.  They felt that Wells Fargo was a retail organization and no place for UHNW investors to conduct business.  One major client told Mr. Whitney: "Jim, this is a retail bank.  I suggest you keep looking."  FMW

---

[30] $215,933 (2015 deferral) - $67,029.90 (2015 deferral under RM Compensation Guide).
[31] $50,625.00 (2015 deferral) - $23,062.50 (2015 deferral under RM Compensation Guide).

itself had never competed with Wells Fargo in the UHNW space.

257.    Mr. Whitney was also concerned about the December 7, 2015 deadline by which the decision needed to be made to go Wells Fargo or somewhere else.  He found the timeframe incredibly tight and grossly unfair.  His clients were concerned about the possibility that Credit Suisse would close its doors on December 8.  Given FWM's business model, FWM almost always had close to 100% of its clients' assets under management and clients were adamant about a contingency plan in the face of all the uncertainty.

258.    After the October 20, 2015 announcement, Mr. Whitney began to notice a decline in Credit Suisse resources available to FWM.  He soon discovered that a significant amount of support staff, including traders, were leaving Credit Suisse, and there would be moments when he would need to transact on large blocks of stock held by certain clients and the phone at the trading desk would just ring without any answer.

259.    While many other RMs attended a conference in St. Louis and spent time with senior Wells Fargo management to better understand its platform and offering, the FWM team had trouble securing a meeting.  Eventually, after Bob Sierens stepped in to help them, Mr. Whitney and Mr. Sakach had their first meeting with Wells Fargo management on or about December 1, 2015.  After several hours of explaining the FWM business model, the feedback they received from Keith Vanderveen, Head of Wells Fargo's Midwest Region, was that the business was just too complicated and would not be a good fit.  Wells Fargo was particularly averse to having such a substantial amount of assets, more than $600 million, held away from the firm.  Additionally, Wells Fargo did not permit wealth strategists to sit in adviser teams, a key component of FWM.  Several days later, Wells Fargo management reached out to FWM and told them they were re-considering their decision, but asked FWM to make a formal presentation at

Wells Fargo's headquarters in St. Louis.

260.    In January 2016, FWM made their presentation to Wells Fargo and discussed their business model, industry trends and potential challenges.  At the conclusion of the meeting, one of the members of Wells Fargo's management approached Mr. Whitney and told him, "Jim, I think we learned more about the ultra-high-net-worth space from you th[a]n you'll learn from us.  Just to be clear, this is a space we'd love to be in, but this is not going to be easy for you."  By late February 2016, Wells Fargo finally made offers to Mr. Whitney, Mrs. DiChristofano and Mr. Sakach.  Ultimately, the uncertainty about how Wells Fargo would import the FWM business model caused FWM to decline Wells Fargo's offer.

261.    FWM had also had discussions with Morgan Stanley Private Wealth, and in February open discussions with its unit Graystone Consulting, which they ultimately joined.

262.    On February 18, 2016, Credit Suisse sent Mr. Whitney, Ms. DiChristofano and Mr. Sakach their Notices of Termination.  The Notices of Termination notified them that their last date of active employment was March 31, 2016 and their employment termination date was August 27, 2016, which they understood to be a garden leave.

263.    Credit Suisse also offered Mr. Whitney, Mrs. DiChristofano and Mr. Sakach Termination Agreements Containing A General Release and Waiver.  Pursuant to Credit Suisse's severance policy, as a result of their involuntary terminations Mr. Whitney was owed $275,000 in severance; Mrs. DiChristofano was owed $268,750 in severance; and Mr. Sakach was owed $265,000 severance.  The Release and Waiver relieved Credit Suisse of all liability to Mr. Whitney, Mrs. DiChristofano and Mr. Sakach, including liability for their unpaid commissions, and required them to serve a two month non-solicitation period following their August 27, 2016 termination date, which would essentially destroy their business.

264.    After receiving his Notice of Termination, in mid-February, 2016, Mr. Whitney had a one-on-one conversation with Meagan Diop.  He had still not received his improperly deferred 2014 and 2015 commissions, and when he questioned her about the issue she responded, "that's above my pay grade, Jim."  She then proceeded to walk Mr. Whitney through the Termination Agreement.  When Mr. Whitney questioned her about why Credit Suisse would need to impose garden leave and non-solicitation provisions, which would effectively kill the FWM business, when Credit Suisse was closing the business, she responded "I'm not here to answer those questions."  Mr. Whitney asked Mrs. Diop if there were any other options available in order to receive his deferred compensation and not wait until the end of the garden leave and non-solicitation periods.  She responded, "your options, Jim, are in this document.  It is in your termination notice.  These are your only options.  You can go to Wells Fargo.  You can go someplace else."  At no point during this meeting did Ms. Diop inform Mr. Whitney that he had any option to accelerate his termination date.  Mr. Whitney was never informed by anyone that such an option existed.

265.    Mrs. DiChristofano also met with Ms. Diop to discuss her Notice of Termination and Termination Agreement.  She explained to Ms. Diop that the garden leave would destroy her business and leave her clients without the services they had come to depend on, and asked Ms. Diop how she could receive her severance.  Ms. Diop responded, "you sign this, and you are an employee of Credit Suisse until August 27.  But you don't come into the office after March 31.  So enjoy your summer."  Mrs. DiChristofano was shocked by Ms. Diop's response and her suggestion to "enjoy your summer" while the FWM business would be ruined by an inability to contact clients.  She told Ms. Diop that "I can't just say goodbye to my clients for however many months this is.  That's not a realistic possibility when you are an advisor."  Ms. Diop simply

responded "well, this is your option.  Then you don't have to sign it.  If you want to talk to your

clients, then don't sign the package."  At no point during this meeting did Ms. Diop inform Mrs.

DiChristofano that she had any option to accelerate her termination date.  Mrs. DiChristofano

was never informed by anyone that such an option existed for her.  During this meeting, Mrs.

DiChristofano also inquired as to how she would be compensated for her unused vacation days

and was never given an affirmative answer.  While Mrs. DiChristofano does not have access to,

and Credit Suisse has refused to provide, documents necessary to calculate to the dollar, the

compensation for these unused vacation days, Credit Suisse has nonetheless failed to compensate

Mrs. DiChristofano for them.

266.    Mr. Sakach also met with Ms. Diop to discuss his Notice of Termination and

Termination Agreement.  At no point during this meeting did Ms. Diop inform Mr. Sakach that

he had any option to accelerate his termination date.  Mr. Sakach was never informed by anyone

that such an option existed for him.

267.    At the same time FWM received its Termination Notices, Credit Suisse sent the

February Letter to FWM's clients informing them that:

> Credit Suisse has decided to exit the Private Banking business in
> the U.S. by March 31, 2016.  After this date, Credit Suisse will no
> longer offer private banking or wealth management services and
> will wind-down all current product offerings and client
> relationships.  *This means that after March 31, 2016 Credit Suisse
> will no longer provide brokerage or investment advisory services
> or provide any investment advice to your account(s).  Rather we
> will only take instructions from you with regards to liquidation of
> your account assets and transfer of your account(s).*

268.    On March 18, 2016, Mr. Whitney, Mrs. DiChristofano and Mr. Sakach left for

Morgan Stanley Private Wealth and submitted protocol letters to Mr. Sierens:

> Please be advised, I plan to move from Credit Suisse to Morgan
> Stanley, effective immediately.  This termination of employment is

the result of a constructive discharge based upon the imminent closing of Credit Suisse's private banking unit in the United States.

269.    On April 11, 2016, Credit Suisse filed a Form U-5 for Mr. Whitney, Mrs. DiChristofano and Mr. Sakach notifying FINRA that they had been terminated and that their reason for termination was "Voluntary."

270.    By letter dated April 7, 2016, Credit Suisse notified Mr. Whitney, Mrs. DiChristofano and Mr. Sakach that their deferred compensation Awards were cancelled retroactively to March 18, 2016.

271.    As of March 18, 2016: Mr. Whitney had been granted 55,434 shares of Credit Suisse AG and $361,000 in cash awards[32]; Mrs. DiChristofano had been granted 3,283 shares of Credit Suisse AG and $22,000 in cash awards[33]; and Mr. Sakach had been granted 14,525 shares of Credit Suisse AG and $72,000 in cash awards[34].  All of these shares and cash awards vested immediately upon their termination without cause.

272.    Credit Suisse's October 21, 2015 statement that RMs could either resign and join Wells Fargo, forfeiting their deferred compensation in exchange for Onboarding Awards, or resign and join a competitor, forfeiting their deferred compensation, was an anticipatory breach of Credit Suisse's contractual obligations to Mr. Whitney, Mrs. DiChristofano and Mr. Sakach, resulting in damages as follows: Mr. Whitney ($1,745,741.32)[35]; Mrs. DiChristofano

---

[32] 50,376 of these shares and $343,000 of the cash awards were from the improper deferral of Mr. Whitney's 2014 and 2015 commissions.

[33] All of these shares and all of the cash awards were from the improper deferral of Mrs. DiChristofano' s 2014 and 2015 commissions.

[34] 11,646 of these shares and all of the cash awards were from the improper deferral of Mr. Sakach's 2014 and 2015 commissions.

[35] $24.98 (10/21/15 CS share price) * 55,434 (outstanding shares) = $1,384,741.32 + $361,000 (cash award).

($104,009.34)[36]; and Mr. Sakach ($434,834.50[37]).

273.    In the alternative, Credit Suisse breached its contractual obligation to Mr. Whitney, Mrs. DiChristofano and Mr. Sakach when it cancelled their deferred compensation on March 18, 2016, resulting in damages as follows: Mr. Whitney ($1,199,162.08)[38]; Mrs. DiChristofano ($71,638.96)[39]; and Mr. Sakach ($291,618.00)[40].

274.    Mr. Whitney was entitled to severance of $275,000.  Mrs. DiChristofano was entitled to severance of $268,750.  Mr. Sakach was entitled to severance of $265,000.

275.    Credit Suisse has failed and refused to pay Mr. Whitney, Mrs. DiChristofano and Mr. Sakach in breach of its contractual obligations and in violation of the New York Labor Law or, in the alternative, Illinois Wage Act.

## DISPUTE, CLAIM, OR CONTROVERSY

276.    FINRA Rule 13200 of the FINRA Code states, in pertinent part:

(a) Generally

Except as otherwise provided in the Code, a dispute must be arbitrated under the  Code if the dispute arises out of the business activities of a member or an associated  person and is between or among:

- •    Members;
- •    Members and Associated Persons; or
- •    Associated Persons.

---

[36] $24.98 (10/21/15 CS share price) * 3,283 (outstanding shares) = $82,009.34 + $22,000 (cash award).
[37] $24.98 (10/21/15 CS share price) * 14,525 (outstanding shares) = $362,834.50 + $72,000 (cash award).
[38] $15.12 (3/18/16 CS share price) * 55,434 (outstanding shares) = $838,162.08 + $361,000 (cash award).
[39] $15.12 (3/18/16 CS share price) * 3,283 (outstanding shares) = $49,638.96 + $22,000 (cash award).
[40] $15.12 (3/18/16 CS share price) * 14,525 (outstanding shares) = $219,618.00 + $72,000 (cash award).

277.    FINRA Rule 13100(1) Defines "dispute" as "a dispute, claim or controversy."

278.    The instant matter is clearly a dispute, claim, or controversy arising out of Credit Suisse's business activities. Claimants are therefore not required to bring statutory or common law causes of action against Credit Suisse in this arbitration.

279.    Notwithstanding the above and the general equitable claim that all of the above referenced conduct by Credit Suisse is wrongful and has harmed Claimants, Claimants bring the following causes of action:

## DEFERRED COMPENSATION (ALL CLAIMANTS)

### COUNT I – BREACH OF CONTRACT
### (All Claimants)

280.    Claimants re-allege each and every allegation of their Third Amended Statement of Claim as if fully set forth herein.

281.    "To establish a breach of contract claim in New York, a plaintiff must show: (1) the existence of an agreement, (2) adequate performance of the contract by plaintiff, (3) breach of contract by the defendant, and (4) damages." *XDTR, LLC v. City of Long Beach, New York,* 2016 WL 5678662 at *4 (E.D.N.Y. 2016) (citing *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)).

282.    Claimants and Credit Suisse entered into employment agreements and dozens of deferred compensation agreements, memorialized in Award Certificates, for deferred compensation. Pursuant to their Award Certificates, Claimants' deferred compensation vested immediately upon their termination without cause.

283.    Claimants were terminated without cause pursuant to the Award Certificates. Claimants were constructively terminated no later than the date each left Credit Suisse.

284.    In the alternative, Credit Suisse breached its contractual obligations to Claimants

when it cancelled their deferred compensation.

285.    Credit Suisse is liable to Claimants for breach of contract in an amount to be proven at the hearing but in no event less than:

### Deferred Compensation

| | |
|---|---|
| Hutchinson: | $1,627,399.84 |
| Vanden Heuvel: | $1,114,552.04 |
| Hirsch: | $334,151.68 |
| Kelly: | $212,379.96 |
| Board: | $113,099.56. |
| Whitney: | $1,745,741.32 |
| Sakach: | $434,834.50 |
| DiChristofano: | $104,009.34 |

## COUNT II – ILLINOIS WAGE ACT
### (Claimants Whitney, Sakach, DiChristofano)

286.    Claimants repeat and re-allege each allegation of the preceding paragraphs as if fully set forth herein.

287.    The Illinois Wage Act "applies to all employers and employees in this State, including employees of units of local government and school districts, but excepting employees of the State or Federal governments."  820 IL ST § 115/1.

288.    The Illinois Wage Act defines wages broadly:

For all employees, other than separated employees, "wages" shall be defined as any compensation owed an employee by an employer pursuant to an employment contract or agreement between the 2 parties, whether the amount is determined on a time, task, piece, or any other basis of calculation. **Payments to separated employees shall be termed "final compensation" and shall be defined as wages, salaries, earned commissions, earned bonuses, and the monetary equivalent of earned vacation and earned holidays, and any other**

73

> **compensation owed the employee by the employer pursuant to an employment contract or agreement between the 2 parties.**

820 IL ST 115/2 (emphasis added).

289.    Credit Suisse's failure to pay Family Wealth Management violated Illinois Wage Act § 115/5.

290.    "Any employee not timely paid wages, final compensation, or wage supplements by his or her employer as required by this Act shall be entitled to recover through a claim filed with the Department of Labor or in a civil action, but not both, the amount of any such underpayments and damages of 2% of the amount of any such underpayments for each month following the date of payment during which such underpayments remain unpaid. In a civil action, such employee shall also recover costs and all reasonable attorney's fees."  820 IL ST § 115/14.

291.    Family Wealth Management are entitled to 100% of their unpaid compensation, with attorneys' fees, costs and supplemental damages in the amount of 2% per month until the compensation is paid.

**COUNT III – BREACH OF THE IMPLIED COVENANT
OF GOOD FAITH AND FAIR DEALING
(All Claimants)**

292.    Claimants repeat and re-allege each allegation of the preceding paragraphs as if fully set forth herein.

293.     In every contract there exists an implied covenant of "good faith and fair dealing in the course of performance." *511 West 232nd Owners Corp. v. Jennifer Realty*, 98 N.Y.2d 144,  153, 773 N.E.2d 496 (N.Y. 2002). Breach of the covenant is breach of the agreement itself, the covenant being "part and parcel" of the agreement or contract. *Boscorale Operating, LLC. v. Nautica Apparel, Inc.*, 749 N.Y.S.2d 233, 234 (1st Dept 2002). The covenant is breached when a  party acts in a manner that deprives the other party of the right

to receive benefits under the agreement. *511 West 232nd Owners Corp.*, 98 N.Y.2d at 153. The covenant encompass[es] "any promises which a reasonable person in the position of the promisee would be justified in understanding were included." *Id.* (quoting *Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 69 (1978)).

294. Credit Suisse announced it was shutting down Claimants' division and told them they needed to find a new firm.

295. Credit Suisse breached the implied covenant of good faith and fair dealing and is liable for the total amount of deferred compensation it has not paid.

## COUNT IV – UNJUST ENRICHMENT
### (All Claimants)

296. Claimants repeat and re-allege each allegation of the preceding paragraphs as if fully set forth herein.

297. In the alternative, Claimants are entitled to relief under the theory of unjust enrichment.

298. "[U]nder New York law, a plaintiff may prevail on a claim for unjust enrichment by demonstrating '(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution.'" *Makhoul v. Watt, Tieder, Hoffar & Fitzgerald, L.L.P.,* 2016 WL 5845933, at *2 (2d Cir. 2016) (quoting *Beth Israel Med. Ctr. V. Horizon Blue Cross & Blue Shield of N.J., Inc.,* 448 F.3d 573, 586 (2d Cir. 2006)).

299. Here, Credit Suisse has benefited from its appropriation and retention of money Claimants generated through service to their clients and Credit Suisse, in an amount to be proven at the hearing but in no event less than:

**Deferred Compensation**

| | |
|---|---|
| Hutchinson: | $1,627,399.84 |
| Vanden Heuvel: | $1,114,552.04 |
| Hirsch: | $334,151.68 |
| Kelly: | $212,379.96 |
| Board: | $113,099.56. |
| Whitney: | $1,745,741.32 |
| Sakach: | $434,834.50 |
| DiChristofano: | $104,009.34 |

300.   Equity and good conscience require restitution.

### COMMISSION TRAILERS (VANDEN HEUVEL, KELLY, HIRSCH)

### COUNT V – BREACH OF CONTRACT
### (Claimants Vanden Heuvel, Kelly, Hirsch)

301.   Claimants repeat and re-allege each allegation of the preceding paragraphs as if fully set forth herein.

302.   Claimants earned commissions on Strategic Partners funds at a rate of 45% set forth by the RM Compensation Guide and as required by the employment agreements between Credit Suisse and Claimants.

303.   Credit Suisse has failed to pay Mr. Vanden Heuvel commission trailers on Strategic Partners funds, including SPVII, in an amount to be proven at the hearing but in no event less than $73,750.

304.   Credit Suisse has failed to pay Mr. Kelly commission trailers on SPVII in an amount to be proven at the hearing but in no event less than $187,500.

305.    Credit Suisse has failed to pay Mr. Hirsch commission trailers on SPVII in an amount to be proven at the hearing but in no event less than $187,500.

306.    Mr. Vanden Heuvel earned commissions on China Harvest Partners, L.P.; China Spring Partners, LP; and Credit Suisse China Harvest II Feeder, L.P.

307.    Credit Suisse has failed to pay Mr. Vanden Heuvel commission trailers on China Harvest Partners, L.P.; China Spring Partners, LP; and Credit Suisse China Harvest II Feeder, L.P.  in an amount to be proven at the hearing but in no event less than $30,000.

308.    Credit Suisse's failure to pay commissions at the rate set forth by the RM Compensation Guide breached its employment agreements with Claimants.

### COUNT VI – UNJUST ENRICHMENT
### (Claimants Vanden Heuvel, Kelly, Hirsch)

309.    Claimants repeat and re-allege each allegation of the preceding paragraphs as if fully set forth herein.

310.    Claimants performed services for their clients and Credit Suisse for which Credit Suisse was paid commissions or fees.

311.    Credit Suisse has been enriched by wrongfully retaining more than $103,750 of commissions or fees owed to Mr. Vanden Heuvel.

312.    Credit Suisse has been enriched by wrongfully retaining more than $187,500 of commissions or fees owed to Mr. Kelly.

313.    Credit Suisse has been enriched by wrongfully retaining more than $187,500 of commissions or fees owed to Mr. Hirsch.

314.    Equity and good conscience require restitution.

**EUROCASTLE COMMISSION (HUTCHINSON)**

**COUNT VII – BREACH OF CONTRACT**
**(Claimant Hutchinson)**

315.    Claimants repeat and re-allege each allegation of the preceding paragraphs as if fully set forth herein.

316.    Mr. Hutchinson's clients purchased 33% of the $300 million Eurocastle equity offering.

317.    Mr. Hutchinson was entitled to an $80,000 commission at Credit Suisse's institutional commission rate.

318.    Credit Suisse arbitrarily deferred the commission rather than paying it in cash, promising to issue an award that was never issued and to vest Mr. Hutchinson on February 15, 2016.

319.    Credit Suisse breached its employment agreement with Mr. Hutchinson when it failed to pay his earned commission pursuant to its compensation policies and is liable to him in the amount of $80,000.

**COUNT VIII – UNJUST ENRICHMENT**
**(Claimant Hutchinson)**

320.    Claimants repeat and re-allege each allegation of the preceding paragraphs as if fully set forth herein.

321.    Mr. Hutchinson performed services for his clients and Credit Suisse for which Credit Suisse was paid commissions or fees.

322.    Credit Suisse has been enriched by wrongfully retaining $80,000 of commissions or fees owed to Mr. Hutchinson.

323.    Equity and good conscience require restitution.

### JUNIOR BRIDGEMAN COMMISSIONS (MICHAEL BOARD)

### COUNT IX – BREACH OF CONTRACT
#### (Claimant Board)

324.    Claimants repeat and re-allege each allegation of the preceding paragraphs as if fully set forth herein.

325.    Pursuant to the PB USA Global Prospecting List Guidelines, Mr. Board was entitled to a 50% split of production and AUM on the Junior Bridgeman account.

326.    Mr. Board was entitled to $18,560.30 in commissions on the Junior Bridgeman account.

327.    Credit Suisse refusal to pay Mr. Board's commission pursuant to its compensation policies and procedures breached its employment agreement with Mr. Board and Credit Suisse is liable to him in the amount of $18,560.30.

### FAMILY WEALTH MANAGEMENT (DICHRISTOFANO, WHITNEY, SAKACH)

### COUNT X – BREACH OF CONTRACT
#### (FWM – Claimants DiChristofano, Whitney, Sakach)

328.    Claimants repeat and re-allege each allegation of the preceding paragraphs as if fully set forth herein.

329.    On February 28, 2012, the FWM Team and Credit Suisse entered a new compensation agreement "effective January 1, 2012."  Its terms were memorialized in numerous e-mails and evidenced by the course of dealing between the parties: (1) 30% split of gross revenues, accrued monthly and distributed at the discretion of Mr. Whitney; (2) monthly draws against commissions; (3) Credit Suisse paying for support staff to the same degree as for other RMs at similar production levels; and (4) deferrals at the RM deferral rates.  This constituted a contract between Credit Suisse and the FWM Team that governed the terms of the FWM Team's

compensation, as a component and condition of their employment agreements. It was agreed to by Tony DeChellis, the head of the US Private Bank, who had actual and apparent authority to bind Credit Suisse.

330. Credit Suisse's breached the contract when it deferred the FWM Team's 2014 and 2015 commissions at rates higher than those provided by the RM Compensation Guide.

331. Credit Suisse is liable to the FWM Team as follows:

| | |
|---|---|
| Whitney: | $997,438.00 (2014)<br>$620,636.00 (2015) |
| Sakach: | $131,850 (2014)<br>$215,933 (2015) |
| DiChristofano: | $55,125 (2014)<br>$50,625 (2015) |

**COUNT XI – ILLINOIS WAGE ACT**
**(FWM – Claimants DiChristofano, Whitney, Sakach)**

332. Claimants repeat and re-allege each allegation of the preceding paragraphs as if fully set forth herein.

333. The Illinois Wage Act "applies to all employers and employees in this State, including employees of units of local government and school districts, but excepting employees of the State or Federal governments." 820 IL ST § 115/1.

334. The Illinois Wage Act defines wages broadly:

For all employees, other than separated employees, "wages" shall be defined as any compensation owed an employee by an employer pursuant to an employment contract or agreement between the 2 parties, whether the amount is determined on a time, task, piece, or any other basis of calculation. **Payments to separated employees shall be termed "final compensation" and shall be defined as wages, salaries, earned commissions, earned bonuses, and the monetary equivalent of earned vacation and earned holidays, and any other compensation owed the employee by the employer pursuant to an employment contract or agreement between the 2 parties.**

820 IL ST 115/2 (emphasis added).

335.    Credit Suisse's breach its agreement to pay earned commissions and failure and refusal to pay commissions violated Illinois Wage Act §§ 115/3-5, 9.  *See* 820 IL ST § 115/3 (requiring timely payment of commissions); 820 IL ST § 115/4 (requiring timely payment of all wages); 820 IL ST § 115/5 (requiring timely payment of "final compensation"); 820 IL ST § 115/9 (prohibiting authorized deductions from wages or final compensation).

336.    "Any employee not timely paid wages, final compensation, or wage supplements by his or her employer as required by this Act shall be entitled to recover through a claim filed with the Department of Labor or in a civil action, but not both, the amount of any such underpayments and damages of 2% of the amount of any such underpayments for each month following the date of payment during which such underpayments remain unpaid. In a civil action, such employee shall also recover costs and all reasonable attorney's fees."  820 IL ST § 115/14.

337.    Claimants are entitled to 100% of their unpaid commissions in amounts to be proven at the hearing but in no event less than

| | |
|---|---|
| Whitney: | $997,438.00 (2014) |
| | $620,636.00 (2015) |
| | |
| Sakach: | $131,850 (2014) |
| | $215,933 (2015) |
| | |
| DiChristofano: | $55,125 (2014) |
| | $50,625 (2015) |

with attorneys' fees, costs and supplemental damages in the amount of 2% per month until the commissions are paid.

81

## COUNT XII – UNJUST ENRICHMENT
### (FWM – Claimants DiChristofano, Whitney, Sakach)

338.    Claimants repeat and re-allege each allegation of the preceding paragraphs as if fully set forth herein.

339.    Claimants performed services for their clients and Credit Suisse for which Credit Suisse was paid commissions or fees.

340.    Credit Suisse has been enriched by wrongfully retaining commissions or fees owed to Mr. Whitney, in an amount to be proven at the hearing but in no event less than .

$997,438.00 (2014)
$620,636.00 (2015)

341.    Credit Suisse has been enriched by wrongfully retaining commissions or fees owed to Ms. DiChristofano, in an amount to be proven at the hearing but in no event less than

$55,125 (2014)
$50,625 (2015)

342.    Credit Suisse has been enriched by wrongfully retaining more commissions or fees owed to Mr. Sakach, in an amount to be proven at the hearing but in no event less than

$131,850 (2014)
$215,933 (2015)

343.    Equity and good conscience require restitution.

## RELIEF

Based on the foregoing, Claimants respectfully request the Panel issue an Award against Credit Suisse providing for[41]:

      a.    Monetary damages equal to their unpaid earned compensation in an amount to be proved at the hearing but not less than:

---

[41] Claimants will submit a damages report to the Panel at the conclusion of the hearing. Claimants reserve their right to amend their damages or damage calculation.

### Deferred Compensation

| | |
|---|---|
| Hutchinson: | $1,627,399.84 |
| Vanden Heuvel: | $1,114,552.04 |
| Hirsch: | $334,151.68 |
| Kelly: | $212,379.96 |
| Board: | $113,099.56. |
| Whitney: | $1,745,741.32 |
| Sakach: | $434,834.50 |
| DiChristofano: | $104,009.34 |

### Commissions

| | |
|---|---|
| Hutchinson: | $80,000 |
| Paul Vanden Heuvel: | $103,750 |
| Hirsch: | $187,500 |
| Kelly: | $187,500 |
| Board: | $18,560.30 |
| Whitney: | $997,438.00 (2014)<br>$620,636.00 (2015) |
| Sakach: | $131,850 (2014)<br>$215,933 (2015) |
| DiChristofano: | $55,125 (2014)<br>$50,625 (2015) |

b.    Attorneys' fees and costs as required by the Illinois Wage Act;

c.    Liquidated damages in an amount equal to the unpaid deferred compensation  as required by the Illinois Wage Act;

d.    Prejudgment interest as required by Illinois law;

e.    Interest to run as required by Illinois law;

f.      For such other relief as the Panel deem just, equitable and proper.


Dated: New York, New York                              **LAX & NEVILLE LLP**
        August 23, 2019

                                          By:     ***/s/ Barry R. Lax***
                                                  Barry R. Lax, Esq.
                                                  Robert R. Miller, Esq.
                                                  Steven T. Davis, Esq.
                                                  350 Fifth Avenue, Suite 4640
                                                  New York, NY 10018
                                                  Tel: (212) 696-1999

                                                  *Attorneys for Claimants*